LOUIS H. SCHULTZ ET AL., Appellants, v. JOHN A. SCHULTZ ET AL.—
293 S. W. 105.

Court en Banc, February 15, 1927.

**1. INSTRUCTIONS: Material Error.** Not all error is prejudicial. The giving of an instruction plainly erroneous will not be held to be reversible error where appellant is unable to show that it was error materially affecting the merits of the action.

**2. WILL CONTEST: Instruction: Prima-Facie Case.** An instruction telling the jury, in effect, that the proponents in introducing the testimony of the two subscribing witnesses made out a prima-facie case in favor of the will, that is, such a case as, in the absence of evidence to the contrary, must be held to be true, and that thereafter it rested upon the contestants to overcome such prima-facie case by substantial evidence, is plain error, in that it sets forth a rule of procedure which the court is bound to follow in the trial of the case, but with which the jury has no concern. But it is not prejudicial error where by other instructions given for both proponents and contestants the jury are told in plain and unequivocal language that the burden is on the proponents to prove by the greater weight of the evidence that testator at the time he signed the instrument possessed a sound and disposing mind and memory.

**3. ———: ———: Alteration: Negativing Undue Influence.** An instruction for proponents, purporting to cover the question of testator's desire to change his valid will, is not erroneous because it does not require the jury to find that there was no coercion or undue influence preventing a change, where no such issue is embraced in the pleadings, and there is no evidence that he was prevented by coercion or undue influence from changing it.

**4. ———: ———: Definition of Soundness of Mind.** An instruction which in its introductory part omits a supposed element of soundness of mind is not erroneous, if, after defining soundness of mind in general terms, it proceeds to point out specifically the facts which it is necessary for the jury to find in order to enable them to find that testator was of sound mind and these include the element it is contended was omitted from the introductory definition.

**5. ———: ———: Minimizing Forgetfulness.** An instruction for proponents telling the jury that old age, physical weakness or imperfect memory caused by sickness or old age, or forgetfulness of names of persons testator has known, will not suffice to establish incompetency or to invalidate the will, is not erroneous as minimizing the evidence pertaining to these things, where the only lapses of memory on testator's part were such as are ordinarily incident to old age, and where, but for the evidence tending to show that he was laboring under a delusion that his brother would have him put in an asylum for the insane unless he willed to the brother his property, there could have been no case for the jury on the issue of testamentary capacity.

**6. ———: ———: Testamentary Capacity: Senile Dementia: Confining Issue to Time of Executing Will.** Where there is some evidence that testator was afflicted with senile dementia and that such disease is permanent and progressive, but also that attacks of it are intermittent and are followed by periods of mental lucidity, and where the evidence strongly tends to show that at the time the will was prepared and executed his mind and memory were clear and vigorous, and that he was suffering from no de-

·lusion respecting any person or thing, and the evidence as a whole. has taken a wide range both as to facts and periods of time covered by it, the court does not err in giving an instruction telling the jury that if they find that testator at the very time the will was executed was capable of comprehending the nature, extent and value of his property, and all the persons who came reasonably within the range of his bounty and their deserts, etc., they should find for proponents, although they should believe that at times, both prior and subsequently to making the will, he did not have sufficient capacity to make a will.

7. ———: **Subject-matter Embraced in Different Instructions: Repetitious: Read Together.** For sake of clarity one subject-matter should be covered by one instruction; but it is not reversible error to give four instructions, which, when taken together, in effect tell the jury that, in determining whether testator had sufficient mental capacity to make a will, they are at liberty to take into consideration the alleged will itself and all its provisions, but if they find him to have been of sound mind and the will to have been his free and voluntary act, then the will is valid, although the disposition of his property therein by the testator made. might be deemed by the jury to have been inequitable, unjust or inappropriate. The rule is that all instructions given must be taken and read as one, and repetitious instructions do not ordinarily constitute a sufficient ground for reversible error.

Corpus Juris-Cyc. References: **Appeal and Error,** 4 C. J., Section 3021, p. . 1039, n. 16; Section 3202, p. 1174, n. 83. **Trial,** 38 Cyc., p. 1756, n. 91; p. 1778, n. 73; p. 1785, n. 90. **Wills,** 40 Cyc., p. 1033, n. 11; p. 1079, n. 89; p. 1335, n. 76; p. 1339, n. 14.

Appeal from Daviess Circuit Court.—*Hon. Arch B. Davis,* Judge.

AFFIRMED.

*Davis & Ashby, L. B. Gillihan, Duvall & Boyd* and *Miles Elliott* ·for appellants.

(1) Instruction D-4 given on the part of respondents, was erroneous because it improperly shifted to and placed upon contestants the burden of proof as to mental capacity. Dunkeson v. Williams, 242 S. W. 653; Mayes v. Mayes, 235 S. W. 100; Major v. Kidd, 261 Mo. 607; Rock v. Keller, 278 S. W. 759. (2) Proponents' Instruction D-5 was erroneous because it permitted the jury to find for the will, even though they might have believed from the evidence that the testator desired or intended to change the provisions of the document or make some other or different disposition of his property, and was, by the exercise of undue influence, prevented from so doing. (3) Proponents' Instruction D-7 is erroneous for two reasons: (a) It erroneously tells the jury that "unsoundness of mind . . . means no more that the ability to know and comprehend what one is doing and the general character of one's property and the persons who reasonably come within the range of his bounty," without requiring an ability or capacity to comprehend or under-

stand the deserts or the objects of his bounty, with reference to their treatment of or conduct toward the testator, their capacities and necessities. Ray v. Walker, 293 Mo. 447; Byrne v. Folkerson, 254 Mo. 120; Crum v. Crum, 231 Mo. 638; Holton v. Cochran, 208 Mo. 314; Meier v. Buchter, 197 Mo. 68. In this respect, it is in sharp conflict with appellants' Instruction P-1. One of them is wrong. Appellants' Instruction P-1 correctly states the law. (b) Its concluding clause improperly minimized, if it did not completely destroy, the testimony of mental incapacity, and was an improper comment on the evidence. Post v. Bailey, 254 S. W. 71; Rock v. Keller, 278 S. W. 759. (4) Proponents' Instruction 11 .was erroneous because it was an unfair comment on the evidence, unduly minimized the testimony showing mental incapacity, both before and after the making of the will, and was misleading in that it was calculated to cause the jury to believe that it was necessary for contestants to show mental incapacity by acts or circumstances occurring at the very instant of the making of the will. (5) Proponents' Instructions 12, 14 and 15 are "jointly and severally" erroneous in that they preclude the jury from considering the propriety, wisdom or justness of the will in passing upon testator's mental capacity. (a) Instruction 12 tells the jury they "are not to consider whether or not the disposition made by the testator is appropriate, or, in the opinion of the jury, just." (b) Instruction 14 tells the jury that the mere fact that the testator "prefers one to another, that is to say, gives to one related in the same degree a smaller portion of his property than he gives to another, has no bearing on the validity of his voluntary act," and tells the jury that they should not "determine upon the wisdom or the justness of the disposition made by the testator of his property whether such disposition is just or right is a question for the testator and for none other than the testator." (c) Instruction 15 says "that the jury has nothing to do with the equity or inequity, the justice or injustice, of the testamentary disposition of property." Any one of these three instructions is alone sufficient to so preclude the jury from considering the character of the disposition of his property, in determining the mental capacity of the testator, as to constitute error. The three of them taken together absolutely forbid the jury from, in any way, considering the wisdom, or unwisdom, justness or unjustness of the will in passing upon the question of mental capacity. Everly v. Everly, 297 Mo. 196.

*Lozier & Morris* and *Dudley & Brandom* for respondents.

(1) There is no question of insane delusion in this case. Everly v. Everly, 297 Mo. 196; Wigginton v. Rule, 275 Mo. 447. (2) There

is no substantial evidence of testamentary incapacity. Therefore that question should not have been submitted to the jury, and any error (if any) in the instructions on that point is immaterial and harmless. Hahn v. Hammerstein, 272 Mo. 248; Winn v. Grier, 217 Mo. 240; Gibony v. Foster, 230 Mo. 106; Spencer v. Spencer, 221 S. W. 80; Hughes v. Rader, 183 Mo. 107; Holland v. Sanford, 276 Mo. 457; Sayre v. Trustees, 192 Mo. 95; Huggengale v. Pauley, 219 S. W. 373; Kleinlein v. Krauss, 209 S. W. 938. (3) There are no prejudicial errors in proponents' instructions; because the instructions taken as a whole properly declare the law. Norton v. Paxton, 110 Mo. 456; Major v. Kidd, 261 Mo. 607; Sanford v. Holland, 276 Mo. 457; Andrew v. Linebaugh, 260 Mo. 623; McNealey v. Murdock, 293 Mo. 16; Winn v. Grier, 217 Mo. 420; Everly v. Everly, 249 S. W. 88; Bensburg v. Washington University, 251 Mo. 644; Mayes v. Mayes, 235 Mo. 105; Sanford v. Holland, 275 Mo. 457; McFadin v. Catron, 138 Mo. 197; Fullbright v. Perry, 145 Mo. 442; Southworth v. Southworth, 173 Mo. 73; Riggin v. Westminister College, 160 Mo. 571; Hatton v. Cochran, 208 Mo. 410; Gibony v. Foster, 230 Mo. 131.

RAGLAND, J.—This is an action under the statute to contest the will of Charles Schultz, late of Caldwell County. The paper writing alleged to be the will of deceased was executed by him in due from March 15, 1922; he died January 7, 1923, at the age of seventy-seven years. The grounds of the contest are the ones which have become more or less conventional in proceedings of this character: mental incapacity and undue influence.

Charles Schultz during all the years of his adult life was a farmer. At the time of his death he owned a farm of four hundred and forty acres near the town of Braymer, on which he resided, and he also owned a smaller one nearby of eighty acres. His lands and personal property were of the approximate value of $80,000 and were all accumulated through his own talents and industry. He was never married. At the time the alleged will was written he had living a brother, defendant John A. Schultz, and nephews and nieces, the children of deceased brothers and a deceased sister, all of whom survived him as his heirs. The plaintiffs and the defendant William J. Schultz are the nephews and nieces just referred to. John A. Schultz was a well-to-do farmer who also resided near Braymer. The children of the deceased brothers and sister were scattered; some of them lived in Caldwell County, but the most of them elsewhere. So far as the evidence discloses the relations existing between Charles Schultz and his kindred, and the relations sustained by the latter to each other, were at all times friendly and cordial. According to the provisions of the instrument purporting

to be his will he disposed of his estate as follows: To his nephew, William J. Schultz, he gave the sum of one dollar; to his niece, Olive Anne Schultz, the sum of $100; to each of his other nephews and nieces (except the children of John A. Schultz) the sum of $500; to the Methodist Episcopal Church of Braymer, Missouri, the sum of $500; to the Methodist Episcopal Church of Catawba, Missouri, the sum of $500; to John A. Schultz "in trust the sum of $150 to be paid to the Catawba Methodist Episcopal Church at the rate of $5 every sixty days for a period of five years;" and to John A. Schultz all the remainder and residue "for his use and benefit during the remainder of his natural life and after his decease to the heirs of his body." He named as executors John A. Schultz, his brother, and Fred Wightman, the cashier of the bank with which he had for years transacted the principal part of his banking business.

As stated Charles Schultz was a farmer; he was also a trader and a feeder and a shipper of live-stock. Most of the actual work on his farms was done by tenants or hired help; but whether by the one or the other, it was under his supervision and control. He was a stockholder in one of the three banks at Braymer and kept accounts with all of them. He loaned money, his own funds—in some instances on personal notes and in others on real estate security. These various activities he vigorously prosecuted in person up to within four days of his death; in doing so he relied at all times entirely upon his own judgment, and it seems to be conceded that from a business standpoint he did not within the last thirty years of his life do a single foolish thing.

The evidence relied upon by the contestants to establish mental incapacity and undue influence is summarized by their counsel in their brief here as follows:

"The evidence showed that in his younger years he (Charles Schultz) was a man of good average or good ability, rugged in his physical make-up, and in his personal habits as to cleanliness and mode of living was about as the average man of his station in life. In his later years, he became filthy, would cook his meals and eat without washing his hands after answering a call of nature and after handling his private parts. He allowed hogs to run in his yard and slopped them there, allowed his chickens to roost on the porch and even on the edge of an uncovered jar of sorghum. He would go about talking to himself. He became very forgetful, and would ask the same question a great number of times in the same conversation; his conversations became disconnected. He forgot his horse and buggy and left it in Braymer on one occasion, would try to drive his horse and buggy while it was tied to a hitching post, and did various other acts showing a loss of memory.

"Though his nieces, Mrs. Viola Hammons, Mrs. Marie Wills, Mrs. Nellie Parker and Mrs. Olive Minor had all been married before

the alleged will was written, and though some of them had children of considerable age before that time, and though he was well acquainted with them, he referred to them in the alleged will by their maiden names of Viola Hughes, Marie Schultz, Nellie Schultz and Olive Ann Schultz, respectively.

"In the latter years, he lost his sense of direction and would get lost in the neighborhood where he had lived for many years, went about with his pants unbuttoned and exposed his person, lost his sense of propriety as to exposing his person. He allowed his cattle to promiscuously inbreed, permitting the bulls to grow up and breed back into the herd, and would have a calf, a yearling and a two-year old sucking the same cow, kept steers until they were five years old. He would get up in the middle of the night to feed his stock. He had unfounded fears and delusions that he was about to be robbed, stayed out with the cattle all one night because of such a fear. He suffered under the delusion that persons were likely to poison him. His sexual inclinations became perverted, he kept his hands on his privates, and he became inclined toword unnatural sexual practices (masturbation). He believed his brother John was threatening to, and was about to, send him to the asylum and have a guardian appointed for him and would do so unless he made a will leaving his estate as John desired.

"The medical testimony on the part of contestants showed that Charles Schultz was at the time he executed the alleged will suffering from senile dementia. The testimony of Dr. C. B. Woolsey, of Braymer, was that he had treated Charles Schultz at different times, the last occasion being in 1922; that during the last three or four years of his life Charles Schultz complained of being dizzy, of shortness of breath and of his heart bothering him; that he was suffering from arterio-sclerosis, a progressive disease, and that during the time he knew in a professional way Charles Schultz was subject to the changes that come from the disturbance of arterio-sclerosis and sclerotic kidneys; that he was suffering from patchy memory and that during the last four years of his life Charles Schultz was afflicted with 'softening of the brain, kind of a senile decay or senile dementia,' and that he considered Charles Schultz of unsound mind. . . .

"In August, 1920, a man giving his name as Schultz and his address as Braymer, and who said he was attending the funeral of his brother Henry Schultz, went to the sanitarium of Dr. C. F. Bryd (a private sanitarium for nervous and mental diseases), in sight of the road from St. Joseph to the home of Henry Schultz, and talked with Dr. Byrd, informing him that his folks near Braymer were theatening to put him in the asylum and that he wanted to avoid going to the asylum and wanted to talk to Dr. Byrd for that reason.

He talked to Dr. Byrd some forty or forty-five minutes, and from his conversation with and observation of the man Dr. Byrd formed the opinion he was of unsound mind. Further testifying upon a hypothetical question, based on the facts shown in evidence, Dr. Byrd testified in his opinion Charles Schultz was suffering from 'some form of dementia—perhaps senile dementia.'

"About the middle of March, 1922, Charles Schultz told an acquaintance that his brother John was threatening to have a guardian appointed for him unless he made a will, willing all his property to John, and that he had to meet John in Braymer the next day. He went to Braymer the next day and met his brother John, whereupon the two of them went to the First National Bank and Charles Schultz went into the bank. John was not going in. The will was written at that bank on the 15th day of March, 1922. Other witnesses saw Charles Schultz and his brother John meet in front of the same bank one day about the middle of March, as Charles Schultz came out of the bank, and the following conversation, in substance, was overheard between them. John said, 'Have you done that?' and Charles Schultz replied, 'Yes, I made it the way you wanted me to. I didn't want to go to the asylum.' "

Charles Schultz's mother during the latter years of her life was insane and for a time was confined in one of the state hospitals for the insane.

Some of counsels' generalizations in the foregoing are broarder than the facts warrant. For example, the statement, "he (Schultz) would ask the same question a great number of times in the same conversation," is based on this testimony of one Abe Gentry: "I have had him ask me my name, ask me who I was more than once in the same conversation." And the following was given as an illustration of the disconnectedness of his conversations as observed by some of the witnesses: (Witness George Silkwood): "The thing I noticed that was peculiar about his conversation was, well, just like you would be talking about plowing corn, and he would turn off then and talk about breaking or about putting up hay, or something like that." The witnesses who testified as to his personal habits, lack of cleanliness, etc., were for the most part persons who had been his tenants or in his employ on the farm. Some twenty-five or thirty business men of Braymer and vicinity, bankers, merchants and farmers, who had known him well, observed nothing in his conduct or conversation during the latter years of his life which indicated a change in any respect in his mental condition.

Charles Schultz did not die from arterio-sclerosis, or from any malady to which such a condition would give rise. On January 3, 1923, he fell from a wagon in which he was riding, breaking his collar bone and the bones in one arm. Two or three days later pneumonia set up and that was followed by his death on the 7th.

John Schultz testified that he never at any time, in a conversation with his brother or any one else, threatened or suggested a proceeding to have his brother adjudged insane; and that the subject of making a will was never broached by either of them in any conversation had between them. Defendants' evidence tended to further show these additional facts: At the time the will was executed John Schultz was a widower; he subsequently remarried; and afterwards, Charles, on one or more occasions, said to Wightman, who had drawn the will, that on account of John's marriage he might want to make some changes. While he was in the hospital following his fall he was visited from time to time by some one or more of John's children, who assisted while there in waiting upon him. During these visits he told them of the provisions of his will, and said that in view of John's marriage he would make some changes unless the will was entirely satisfactory to them as it had been written. Upon receiving the assurance of each that he was perfectly satisfied, he sent for Wightman and told him that he would let the will stand as it was. Prior to the conversations just referred to neither John Schultz, nor any of his children, had any knowledge of Charles's having made a will.

The trial court gave the jury, among others, the following instructions:

P-1. "The court instructs the jury that the burden is upon the defendants to prove by the preponderance or greater weight of the evidence that at the time he signed the paper writing offered in evidence as his last will and testament Charles Schultz was of sound and disposing mind and memory, that is to say, that the said Charles Shultz had sufficient mind and memory:

"1st. To understand the ordinary affairs of life, and,

"2nd. To understand the nature, extent and value of his property, and,

"3rd. To understand the number and names of the persons who were the natural objects of his bounty, and,

"4th. To understand their deserts with reference to their conduct toward and treatment of him, their capacities and necessities, and,

"5th. Had sufficient active memory to retain all these facts in his mind long enough to have a will prepared.

"And unless defendants have proved by the preponderance or greater weight of the evidence that the said Charles Schultz had such a mind and memory at the time he signed said paper writing, you should find that the same is not his will and return your verdict accordingly."

P-3. "The court instructs the jury that in determining the issue of whether or not the said Charles Schultz was of sufficient mental ca-

pacity to make a valid will at the time he signed the paper writing offered in evidence, purporting to be his last will and testament, you may take into consideration the instrument itself and all its provisions, in connection with all the other facts and circumstances in evidence.''

D-4. ''Under the law of this State, every male person being twenty-one years of age and upwards, may dispose of all of his estate by will, in such manner as he sees fit and proper, provided he is, at the time he makes the will, of sound mind, and provided the will is in writing, or typewritten, which is the same thing, and is signed by him and is attested by two or more competent witnesses subscribing their names thereto in his presence.

''If therefore the jury believe and find from the evidence in this cause that the writing produced and read in evidence was formally executed by Charles Schultz, according to the above requirements of the law, and that two subscribing witnesses thereto have testified to the sanity of Charles Schultz and that he was of proper age to make a will, then the court instructs you that a prima-facie case in favor of the will is made out, and it rests upon the contestants, that is the plaintiffs in this case, to overcome this prima-facie case by substantial evidence. By prima-facie, as here used, is meant such a case as, in the absence of evidence to the contrary, is held to be true.''

D-5. ''If the jury believe and find from the evidence that the paper writing offered in evidence and proposed as the will of Charles Schultz, was signed by him in the presence of two witnesses, Loren O. Wetzel and Grace E. Klein, and declared by him to be his will; and that said Loren O. Wetzel and Grace E. Klein, at his request and in his presence and in the presence of each other, at that time, subscribed their names as witnesses thereto; and at the time of his subscription to said instrument and at the time of such subscription and declaration he was of sound mind and more than twenty-one years of age, and was not unduly influenced in the execution thereof as defined in other instructions herein, then the jury will find said paper writing to be the will of said Charles Schultz, even though you may believe from the evidence that thereafter Charles Schultz desired or intended to change the provisions of said document, or make some other or different disposition of his property.''

D-6. ''The burden rests upon defendants to prove, by the preponderance or greater weight of all the credible evidence, that Charles Schultz, at the time of making the will in question, possessed a sound and disposing mind and memory, as defined in other instructions.

''By the expressions 'preponderance of the evidence,' or 'preponderance or greater weight of all the credible evidence,' is not meant the mere number of witnesses who testified for or against a given

question of fact in issue before you. Such expressions mean that after you have fully and carefully considered all the evidence in the case, you should decide any one of the questions of fact in favor of the party with whom you find the proof of such fact to have the most convincing effect upon your mind, after you have fully considered all the facts and circumstances in evidence bearing upon such question.''

D-7. ''The court instructs the jury that soundness of mind as used in these instructions means no more than the ability to know and comprehend what one is doing and the general character of one's property and the persons who reasonably come within the range of his bounty; and therefore if the jury believe from the evidence that Charles Schultz signed the paper read in evidence as his last will, and that at the time of doing so he had sufficient mind and memory to know that he was disposing of his property by will, to whom he was giving it, and who came reasonably within the range of his bounty, and their deserts with reference to their conduct and treatment of him, their capacity and necessities, and the general value, nature and character of his property, without the aid of any other person, then he was of sound mind; but by this is not meant that the testator must, at the time of the execution of the will, be able without aid or assistance to recall each item of his property, or the Governmental description of each tract and parcel of land which he may own, or the individual names of all of his debtors; but in that respect it is only required that he have a general, independent, individual knowledge of these matters. And in this connection you are further instructed that old age, physical weakness or imperfect memory caused by sickness or old age, or forgetfulness of the names or persons he has known, or the requiring of a repetition of information, will not be sufficient to establish incompetency or to invalidate the will, if he has sufficient intelligence remaining to fulfill the above definition.''

D-11. ''The court instructs the jury that the testimony as to the mental condition of Charles Schultz prior to and subsequent to the date of the signing of the paper writing offered in evidence was admitted only for the purpose of throwing light upon his mental condition at the time of the execution of the said paper writing.

''The final test of his capacity to make a will is, 'Was he at the very time it was executed capable of comprehending the nature, extent and value of his property, and all of the persons who came reasonably within the range of his bounty and their deserts, with reference to their conduct toward and treatment of him, their capacities and necessities, and did he have sufficient intelligence to understand that he was making his will and the disposition he was making of his property?' And even though you may believe that at times, both prior and subsequent to the making of the will, the testator did

316 Mo.—47.

not have sufficient capacity to make a will within the meaning of these instructions, yet if you believe that at the time he signed the said paper writing, to-wit, March 15, 1922, he had such capacity, your verdict should be for the defendants in so far as the issue of the mental capacity of said Charles Schultz, deceased, is concerned."

D-12. "The court instructs the jury that a man who is of sound mind, as defined by other instructions, if not induced to do so by 'undue influence,' as defined by other instructions, has the right to dispose of his property by will as he may choose, even to the entire exclusion of those who but for the will would be the heirs of his estate; and the jury are not to consider whether or not the disposition made by the testator is appropriate, or, in the opinion of the jury, just, but simply whether the paper propounded as his will be or be not his last will and testament."

D-14. "The court further declares that the law does not demand that a testator dispose of his property and distribute it equally among those who would be his heirs in the event he should die without a will; on the contrary, one who has property may dispose of it by will as to him shall seem meet and proper. The mere fact that in his will he prefers one to another, that is to say, gives to one related to him in the same degree a smaller portion of his property than he gives to another, has no bearing on the validity of his voluntary act, nor is the testator under such circumstances called upon to assign reasons for making a distinction between the several beneficiaries under his will. The jury should not substitute its judgment for the testator's judgment, nor should they determine upon the wisdom or the justice of the disposition made by the testator of his property; whether such disposition is just or right is a question for the testator, and for none other than the testator."

D-15. "The court instructs the jury that no next of kin, no matter how near they be, can be said to have any legal or equitable right to their kinsman's estate, which can be asserted against the will of said kinsman. The law of the land has placed every person's estate wholly under the control of the owner, subject to such final disposition of it as he may choose to make (if of sound mind and if not caused to give the same by undue influence) by his last will and testament. Relatives have no natural right to the estate of their kinsman which can be asserted against his disposition of it by will, if such will be made when the owner is of sound mind. The jury has nothing to do with the equity or inequity, the justice or injustice of the testamentary disposition of property, provided the testator had sufficient mental capacity to make a will at the time he made the same, and provided he was not induced to make the same by undue influence as defined by other instructions."

Instructions on undue influence were given, but no complaint is made of them.

The jury found the issues for the proponents of the will. From the judgment given in accordance therewith plaintiffs prosecute this appeal.

Error is assigned only as to defendants' instructions. They will be considered in the order in which they have been set out, each from the angle of appellants' criticism of it.

I.   Defendants' Instruction 4 told the jury, in effect, that defendants in introducing the testimony of the two subscribing witnesses made out a prima-facie case in favor of the will, that is, such a case as, *in the absence of evidence to the contrary,* must be held to be true, and that thereafter it rested upon the plaintiffs to overcome such prima-facie case by substantial evidence. The giving of the instruction was error—plain and unadorned. It set

**Prima-Facie Case.** forth a rule of procedure which the court was bound to follow in the trial of the cause, but with which the jury had no concern whatever. [Griffith v. Casualty Co., 299 Mo. 426.] Was the error prejudicial? By both plaintiffs' Instruction 1 and defendants' Instruction 6 the jury were instructed in plain and unequivocal language that the burden was upon the defendants to prove by the preponderance or greater weight of the evidence that Schultz at the time he signed the instrument purporting to be his will possessed a sound and disposing mind and memory. The instruction in question was not in conflict with either of them. The most that can be said of its possible prejudicial effect is that, when read in connection with the other two instructions, it may have tended to so confuse and mystify the lay minds of the jurors that they were unable to tell who had the burden of proof. It is an ancient dogma of appellate practice that all error is presumed to be prejudicial, and the doctrine has never been cast into the discard by this court through any formal pronouncement. Nevertheless, we have in recent years, in conformity with both the letter and spirit of what is now Section 1513, Revised Statutes 1919, refused to reverse judgments unless the appellant or plaintiff in error was able to show not only that error had been committed, but that the error was one "materially affecting the merits of the action." From a careful consideration of the record as a whole it does not appear to us that appellants were prejudicially affected by the giving of the instruction under review. This assignment is therefore overruled.

II.   The criticism leveled at defendants' Instruction 5 is this: "In purporting to cover the question of the testator desiring to change the will or to make some other or different disposition of his prop-

erty, without negating the proposition of coercion or undue influence
preventing the change, the instruction was . . . er-
**Change of** roneous.'' The contention amounts simply to this: the
**Will.** the jury should have been permitted to find that the
testator was prevented by undue influence from revoking
or altering a valid will. No such issue was embraced within the plead-
ings. In addition to that fact that was no evidence which remotely
tended to show that the testator was prevented by coercion or undue
influence from putting into effect the possible changes in his will
which he at one time had in mind.

III. The first criticism made of defendants' Instruction 7 is that
the definition of ''soundness of mind'' found in the introductory
part of it omits an essential element of testamentary capacity, name-
ly, the ability to understand and appreciate the deserts of the nat-
ural objects of the testator's bounty, with reference to
**Omission of** their conduct toward and treatment of him, their ca-
**Element.** pacities and necessities. The instruction, however, after
defining soundness of mind in general terms proceeds to point out
specifically the facts which it was necessary for the jury to find in
order to enable them to find that Schultz was of sound mind, and
these include the element claimed to have been omitted. It is incon-
ceivable that the jury with this instruction and plaintiffs' Instruc-
tion 1 both before them could have failed to have a clear and accu-
rate understanding of what is meant by ''soundness of mind,'' with
respect to making a will.

It is further claimed that the latter part of the instruction, deal-
ing with old age, physical weakness, imperfect memory, etc., operated
to minimize, if not destroy, plaintiffs' evidence. The contention is
based on what was said in Post v. Bailey et al., 254
**Minimizing** S. W. 71, where an instruction concluding in the
**Forgetfulness.** same language was condemned. The basis of the
ruling in that case is fully disclosed by the opinion. The facts of
this case are entirely different. While Charles Schultz had become
somewhat enfeebled as the result of advancing years, he was active
and fairly vigorous to the end of his life. The lapses of memory on
his part, as shown by the evidence, were such as are ordinarily inci-
dent to old age. They did not evidence a lack of testamentary ca-
pacity. But for the evidence which tended to show that he was la-
boring under a delusion that his brother John would have him put
in an asylum unless he willed John his property, there would have
been no case for the jury on that issue. The giving of the instruc-
tion was not error.

IV. Appellants' chief complaint of defendants' Instruction 11
is couched in this language:

"The instruction is based on a hypothesis not justified by the evidence.  There was no intimation in the testimony that the disease which affected the mind of Charles Schultz was transitory or intermittent, or that he had lucid intervals.  But the evidence showed that he was afflicted with senile dementia, a permanent and progressive mental disease.  Therefore, this instruction was not warranted by the evidence and was prejudicial error."

**Confining Capacity to Time of Execution.**

The view of the evidence entertained by appellants is decidedly incomplete.  It is true as they contend that the medical evidence offered by them tended to show that Schultz was affected with senile dementia, a permanent and progressive disease; but it did not show that the effect of the disease, in preventing the normal functioning of the mental faculties, was constant and unfailing.  On the contrary Dr. C. B. Woolsey, a witness for plaintiffs, testified:  "Cerebral softening does not mean that it is just a matter of softening all the time, but it is a process and old people will have attacks of it, then they will get over this attack, but they become demented more and more each time."

With reference to Schultz he said:  "*At times* his memory wasn't good."  Defendants' evidence relating to the preparation and signing of the will, including the directions given by Schultz and his conduct and demeanor generally with reference thereto, strongly tended to show that at that time at least his mind and memory were clear and vigorous and that he was suffering from no delusion with respect to his brother John or any other person or thing whatever.  The evidence as a whole, as is usual in such cases, took a wide range both as to facts and as to the period of time covered.  It was proper therefore that the jury be given some direction that would assist them in evaluating and applying it.  The instruction in question served that purpose.  It was not error.

5.  The complaint made of defendants' Instructions 12, 14 and 15 is that they prevented the jury from considering the provisions of the will in passing upon the question of the testator's mental capacity.  These instructions must be read in connection with plaintiffs' Instruction 3.  The four taken together told the jury, in effect, that for the purpose of determining whether Charles Schultz had sufficient mental capacity to make a will they were at liberty to take into consideration the alleged will itself and all of its provisions; but if they found him to have been of sound mind and the will to have been his free and voluntary act, then the will was valid, although the disposition therein made by the testator of his property might be deemed by the jury to be inequitable, unjust or inappropriate.  From the standpoint of clarity it would have been much better had the subject-matter of the four instructions been dealt with by

one of reasonable brevity. But according to our precedents all of the instructions in a case must be taken and read as one; and repetitious instructions ordinarily do not constitute a sufficient ground for the reversal of a judgment.

In support of this assignment appellants rely upon Everly v. Everly, 297 Mo. 196, 249 S. W. 88. In that case an instruction somewhat similar to defendants' Instruction 12 was held to be erroneous. It was condemned on the ground that it contained "the specific direction that it made no difference what was the disposition of the [testator's] property. The jury were allowed to consider all the will, but were admonished that they were not to consider that feature of it." The instructions in this case (the four taken together) are not subject to that criticism.

The record disclosing no reversible error, the judgment of the circuit court is affirmed.

All concur, except *Graves, J.,* absent, and *White, J.,* who dissents.