**Charles Byron WADE et al., Appellants,**

v.

**KIRKSVILLE COLLEGE OF OSTEOPATHY AND SURGERY, a Corporation; the Washington University, a Corporation; and Mae Allen, Executrix of the Estate of Julia Victoria Wade, Respondents.**

No. 43853.

Supreme Court of Missouri.

Division No. 1.

Sept. 13, 1954.

Finch & Finch, F. L. Jackson, Cape Girardeau, Barton & Arnold, Stephen Barton, Benton, for appellants.

Bailey & Craig, Sikeston, Limbaugh & Limbaugh, Cape Girardeau, for respondents.

LOZIER, Commissioner.

This is a will contest filed in the Circuit Court of Scott County and transferred on change of venue to the Cape Girardeau Court of Common Pleas, Cape Girardeau County. The verdict sustained the will and judgment was entered accordingly. Plaintiffs-contestants (herein called contestants) appealed. As the record affirmatively shows both that title to real estate is involved and that "the amount in dispute, exclusive of costs, exceeds" $7,500, this court has appellate jurisdiction. Art. V, § 3, Const., 2 V.A.M.S., p. 31; Donnan v. Donnan, Mo.Sup., 264 S.W.2d 318[1].

Contestants' only allegations of error are that the trial court erred in giving Instructions 5 and 6 at the request of defendants-proponents (herein called proponents). Proponents deny that the two instructions were improperly given and assert that, in any event, contestants failed to make a sub-missible case. However, we can assume without deciding that contestants did make a submissible case. This, because we have concluded that the errors, if any, in Instructions 5 and 6 do not require a reversal and remand.

Julia Victoria Wade of Benton, Scott County, Missouri, died on April 16, 1951. On March 12, 1949, she had executed her last will and testament. The document, including the attestation clause, was in her own handwriting. In "Article 1," she directed payment of debts and funeral expenses. In "Article 2," she gave and bequeathed $1 to each of five named nephews, three named nieces and the named adopted son of a predeceased brother, Sidney. In "Article 3," she bequeathed funds for the purchase of a monument for each of the graves of two uncles. In "Article 4," she devised and bequeathed the remainder of her estate "to the following institutions namely as follows—1st Washington University School of Medicine, St. Louis, Missouri, seventy five percent (75%) of my holdings and 2nd For benefits received through osteopathy I bequeath the remaining twenty five (25%) to Kirksville College of Osteopathy and Surgery, Kirksville, Missouri." She appointed Mrs. Mae Allen as executrix without bond.

The two institutions and the executrix are proponents. Contestants are the nephews, nieces, grandnephews and grandnieces of Julia (a nephew and niece named in the will predeceased her) and Sidney J. Wade, described in "Article 2," of the will as the adopted son of her predeceased brother Sidney.

The sole issue pleaded and submitted by contestants was Julia's mental capacity, at the time the document was executed, to make a will. Proponents' evidence established due execution. Each of the three attesting witnesses (the executrix and two other women neighbors, each of whom had known Julia for over forty years) testified that Julia was sane at the time the will was executed. Proponents' other evidence was corroboratory of the testimony of the attesting witnesses as to Julia's sanity. Con-

testants offered substantial evidence (we have assumed without deciding) tending to show that Julia was not of sound mind when she executed the will. The weight of the evidence, of course, was for the jury which, by its verdict, found that, at the time she executed the will, Julia had the mental capacity so to do.

The evidence relating to the claimed impropriety of Instructions 5 and 6 (insofar as now urged by contestants) was: Julia was 81 years old when she died. She never married. She left surviving her no brothers or sisters. For many years she and her brother Robert maintained a home in Benton. Robert died in 1946.

Julia was bedfast for several years before her death. She had high blood pressure and a hardening of the arteries that accompanies age. Since 1946, her doctor had been an osteopathic physician, a graduate of the Kirksville College of Osteopathy and Surgery, an instant institution-beneficiary-proponent. Julia's father and one brother, Sidney, had been physicians. Sidney had received his medical education at Missouri Medical College, St. Louis, "which now belongs to the Washington University," the other institution-beneficiary-proponent.

The transcript shows that one niece-contestant lives in the State of California. One nephew-contestant lives in Montana. A nephew-contestant and a niece-contestant live in St. Louis, Missouri. Nephew-contestant Byron Wade lives in Benton, Missouri. Another nephew-contestant lives in Oran, Scott County, Missouri (of which county Benton is the county seat). The residences of the contestants-heirs of the nephew and niece named in the will and predeceasing Julia were not shown. The residence of contestant Sidney J. Wade (the adopted son of Julia's predeceased brother Sidney) is in Jefferson City, Missouri. Except as hereinafter noted, the record does not show that any of the contestants ever visited or even corresponded with their bedfast aunt or grandaunt Julia.

Byron Wade (the nephew-contestant who lives in Benton) testified that, after his uncle Robert's death, he gave his aunt Julia "certain help"; he administered his uncle Robert's estate in which she had an interest; she "handled" her own properties; she would ask him for advice on her business affairs "three or four times a week"; he paid her taxes for her; she would telephone him at his office and he would "run up there to help her when I needed to be on the job"; he "had trouble keeping help" at his aunt's; "they would leave and I had to make other arrangements to get somebody else"; once for about three months (including the month in which the will was executed, according to another witness) when he could get no other help, Byron stayed with his aunt at night and his wife stayed with her during the days; Julia could not get along with the women he sent to help her; "they never suited her"; in handling her affairs, he "had no difficulty with her * * * those matters were worked out on a business basis"; he was "just looking after her stuff and trying to look out for her welfare and I was having trouble keeping people there, that was the main trouble I had with her"; she "didn't discuss the rest of her relatives, didn't ever talk about them much."

Mrs. Byron Wade, who often visited Julia, corroborated her husband as to the difficulty in keeping help for Julia and as to her (Mrs. Wade) staying with Julia in the daytime during the three months her husband stayed there at night.

Mrs. Sidney J. Wade, Sr., the widow of Julia's brother Sidney, stayed with Julia the three or four weeks following Robert's death in 1946 but never visited her thereafter.

Contestants' evidence was that Julia would call Byron to her home, discuss business matters with him, ask his advice and then "say terrible things about him" after he left. Julia had these "illusions" about Byron: He, or his son Charles, had taken $700 cash which she had hidden in her bed and later found; in settling the estate of her brother Robert, he (Byron) "got what was coming to her."

As to the latter, Byron Wade testified that Julia never accused him of taking "her share" of Robert's estate; she understood that she had an agreement with Robert that each was "to will their property" to the other; she made a will to that effect and thought he had; she learned after his death that he had not.

Instruction 5 was: "The court instructs the jury that Julia Wade had the right to dispose of her property by will as she chose, even to the entire exclusion of those who, but for the will, would be the heirs of her estate, and if you find and believe from the evidence that, at the time she executed the will in question, Julia Wade had the mental capacity necessary to make a will, then the jury is not to consider whether the disposition made by her is appropriate or unappropriate."

Contestants say that Instruction 5 is erroneous because: One of the factors to be considered by the jury in determining Julia's mental capacity was her capability of understanding "the reasonable claims of the persons who may have had reasonable and natural claims on her bounty"; and that the instruction told the jury that it was not to consider the appropriateness or unappropriateness of the disposition Julia made of her property; therefore, the instruction excluded from the jury's consideration an "essential factor" in determining whether Julia had the mental capacity to make a will.

■ "Evidence of unnatural provisions of a will is not sufficient in itself to establish either undue influence or mental incapacity. The law recognizes that a person of requisite age, free from undue influence and of sound mind, may, if he so desires, execute an unnatural will, disinherit his own kin, and bequeath his property to an entire stranger; but, where there is other substantial evidence of testamentary incapacity or undue influence, the unnatural provisions of the will, if any, may be considered, together with the other facts and circumstances tending to show such incapacity or undue influence." Kaechelen v. Barringer, Mo.Sup., 19 S.W.2d 1033, 1037[10]. See Guidicy v. Guidicy, 361 Mo. 1127, 238 S.W.2d 380, 384[2, 3], and cases cited therein.

In a recent will contest case, this court said "that all instructions must be read and construed together; that where a series of instructions thus taken together contain a complete exposition of the law and cover every phase of the case, there is no prejudicial error; and that when taken and construed together, they harmonize and clearly and specifically require the finding of all essential elements, then any indefinite, ambiguous, and misleading language in the plaintiff's instruction is hereby cured." Guidicy v. Guidicy, 361 Mo. 1127, 238 S.W.2d 380, 385. And see Norris v. Bristow, Mo.Sup., 236 S.W.2d 316, 321[12–14]; Kaechelen v. Barringer, Mo.Sup., 19 S.W. 2d 1033, 1039[18, 19]; Schultz v. Schultz, 316 Mo. 728, 293 S.W. 105, 110[6–8]. In another recent will contest case, we said: "We have often stated the rule that, whether an instruction 'was misleading depends upon how it would be understood by a jury composed of ordinarily intelligent laymen when read in connection with all of the other instructions in the case.' Mueller v. Schien, 352 Mo. 180, 176 S.W.2d 449, 453." Machens v. Machens, Mo.Sup., 263 S.W.2d 724, 732[7].

■ Now, Instruction 5, standing alone, did not expressly exclude from the jury's consideration, in its determination of Julia's mental capacity, the requirement of capability of understanding "the reasonable claims of the persons who may have had reasonable and natural claims on her bounty." But the other instructions made very clear that the sole issue for the jury was whether Julia had "mental capacity" to make a will and that, in determining that issue, the jury might consider the appropriateness or inappropriateness of the disposition made by her of her property "under all of the circumstances in evidence."

In Instruction 1, the jury (after being told that the evidence showed the due execution of the instrument) was instructed that "the only issue to be determined by the jury is whether, at the time she executed

said instrument, Julia Wade had the *mental capacity* necessary to make a will." (All italics in the instructions are ours.)

Instruction 2 told the jury that "the time to be looked to by the jury in determining whether Julia Wade had the *mental capacity* necessary to make a will is the time when the will was executed" and that evidence of occurrences before and after that time had been admitted solely as tending to show the state of her mind when she signed the instrument.

In Instruction 9, the jury was told that proponents had the burden of showing that Julia "had the *mental capacity* necessary to make a will, *as defined in the other instructions.*"

Instruction 8, given at contestants' request, was: "The court instructs the jury that, while it is the law that one who possesses a sound mind may dispose of his or her property by will, yet, it is also the law that, before a will can be held valid, it must be proven that at the time the will was executed the person making the will was of sound mind. *Sound mind,* as here used, means such a mind as enables a person executing a will to be *capable of understanding* the act he is performing, capable of knowing the property he possesses, and *the disposition he is making of such property, and capable of understanding the reasonable claims of the persons who may have reasonable and natural claims on his bounty.* Therefore, in this case, unless the evidence reasonably satisfied the jury that Julia Victoria Wade, at the time she executed the paper writing mentioned in evidence, possessed a sound mind *as above defined,* then such paper writing is not the will of the said Julia Victoria Wade, and your verdict should be for the plaintiffs and against the will."

Instruction 3 was: "The court instructs the jury that, in determining the issue of whether Julia Wade had the *mental capacity* necessary to make a valid will at the time she signed the instrument in question, *you may take into consideration the instrument itself and all its provisions, in connection with all the other facts and circumstances in evidence.*"

Instruction 4 was: "The court instructs the jury that, under the law of the State of Missouri, Julia Wade was not obliged to leave any part of her estate to any of the plaintiffs and she was not obliged to mention any of the plaintiffs in her will."

█ Instruction 6 was: "The court instructs the jury that if you find and believe from the evidence that on March 12, 1949, at the time she executed the will in question, Julia Wade understood the ordinary affairs of life and the nature and extent of her property; *knew who comprised the objects of her bounty; and understood that by the instrument she was executing she was giving her property to the persons and institutions named in her will, in the manner in which that instrument recites,* then Julia Wade had the *mental capacity* necessary to make a will and your verdict will be for the defendants."

Note that Instruction 9 referred to "mental capacity * * * as defined in other instructions." Note that the definition of a "sound mind" in contestants' own Instruction 8 included the capability of "understanding the disposition" one "is making of" his property and the capability of "understanding the reasonable claims of the persons who may have reasonable and natural claims on his bounty." Note that Instruction 3 authorized the jury to consider "the instrument itself and all its provisions in connection with all the other facts and circumstances in evidence." Note that Instruction 4 (of which contestants do not complain) was that Julia "was not obliged to leave any part of her estate to any of the" contestants or to mention any of them in her will. Note that the first part of Instruction 5 (of which part contestants do not complain) was that Julia "had the right to dispose of her property by will as she chose even to the entire exclusion of those who, but for the will, would be the heirs of her estate." Note that Instruction 6 included, as a factor for consideration in determining Julia's "mental capacity" a knowledge of "who comprised the objects of her bounty" and an understanding that she was "giving her property to the persons and

institutions named in her will, in the manner in which that instrument recites."

We are convinced that there was no misdirection in Instruction 5. Read with the other instructions, Instruction 5 told the jury, in effect: If, after you have considered the instrument itself and all its provisions—including the appropriateness or inappropriateness of Julia Wade's disposition of her property under all the other circumstances shown by the evidence—you find that she had the mental capacity to make a will, as defined in other instructions, then you will not further consider whether such disposition was appropriate or inappropriate. We so hold. Schultz v. Schultz, 316 Mo. 728, 293 S.W. 105, 110[6–8]; Townsend v. Boatmen's Nat. Bank, 340 Mo. 550, 104 S.W.2d 657, 669[7]; Kaechelen v. Barringer, Mo.Sup., 19 S.W.2d 1033, 1039[18, 19]; Machens v. Machens, Mo.Sup., 263 S.W.2d 724, 732[7].

Contestants' cited cases are not applicable. In Everly v. Everly, 297 Mo. 196, 249 S.W. 88, 91[3], and Hartman v. Hartman, 314 Mo. 305, 284 S.W. 488, 490[6], the error in the challenged instructions (2D and C, respectively) "was not cured" by the other instructions. In Smith v. Fitzjohn, 354 Mo. 137, 188 S.W.2d 832, 834[7], the contestants failed to make a submissible case and the challenged instruction was not considered together with the other instructions. The first case cited is Schultz v. Schultz, supra, wherein it was held that the challenged instructions, read together and with another instruction, were "not subject to" the criticism made of Instruction 2D in Everly v. Everly, supra.

We find no merit in contestants' contention that Instruction 5 is also erroneous in that it singles out and gives undue prominence to and comments upon certain evidence. Contrast the refused instruction singling out and commenting upon evidence in Hughes v. Rader, 183 Mo. 630, 712, 82 S.W. 32, 55, cited by contestants. Instruction 5 no more singles out and comments upon the evidence than does contestants' Instruction 8.

Contestants say: "Instruction 6 is confusing. It belittles and dwarfs the impor-

tance of the issues. It fails to require the elements which go to make up the test in determining testamentary capacity. It is an abstract statement of the law. Its effect was to minimize, if not wholly destroy, the effect of plaintiffs' Instruction 8. Where an instruction goes no further than Instruction 6 in setting out the evidence which goes to make up the test of mental capacity, it puts an undue limitation upon the definition of soundness of mind, and therefore is faulty."

Contestants cite Hartman v. Hartman, supra, 284 S.W. 488, 490[4]. However, Instruction B in that case contained the "belittling" words that sound mind "meant no more than" etc. See Pulitzer v. Chapman, 337 Mo. 298, 85 S.W.2d 400, 415[14]; Carl v. Ellis, Mo.App., 110 S.W.2d 805, 807[3]. No such "belittling" language appears in instant Instruction 6. Too, Instruction B in the Hartman case, after defining a "sound mind," told the jury: "Neither old age, nor imperfect or failing memory, caused by sickness or old age, is sufficient to justify a finding that the testator was of unsound mind if, at the time he executed the will, the testator had sufficient mind and intelligence to meet the requirements above set out." Such, the court held, was a comment on the evidence and minimized if not destroyed the effect of the contestants' evidence. No such language appears in instant Instruction 6. Instruction 6 contains no comment on any of the evidence—particularly, contestants' evidence as to the services the Byron Wades rendered to Julia.

Contestants argue that the requirements of Instruction 6 as to one factor of mental capacity is more general than, and in conflict with, those defined in Instruction 8. Again reading and construing the instructions together, we must conclude that the jury could not have been misled. Instruction 6 required Julia to have understood "the nature and extent of her property," to have known "who comprised the objects of her bounty," to have "understood that * * * she was giving her property to the persons and institutions named in her will." Instruction 8 included as a factor

of "sound mind," capability of knowing the property one possesses and capability "of understanding the reasonable claims of the *persons* who may have reasonable and natural claims on his bounty." Byron Wade, one of the "persons" named in Julia's will, was, under contestants' evidence, a "person" who might have had a reasonable and natural claim upon Julia's bounty. (As suggested, there was no evidence as to any claim—other than that of mere collateral relationship—of any other person named in Julia's will or who might have had a "reasonable and natural claim upon her bounty.") We cannot see wherein Instruction 6 minimized in any way the effect of Instruction 8.

The judgment is affirmed.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by LOZIER, C., is adopted as the opinion of the court.

All concur.