**DONNAN et al. v. DONNAN et al.**

No. 43353.

Supreme Court of Missouri.

Division No. 1.

Feb. 8, 1954.

Donnelly & Donnelly, Lebanon, Forrest C. Donnell, St. Louis, for appellants.

Breuer & Northern, Rolla, for respondents.

LOZIER, Commissioner.

■ This is a contest of the will of A. C. Donnan. The verdict was for plaintiffs-contestants and judgment was entered setting the will aside. Defendants-proponents appealed. The record affirmatively

shows both that title to real estate is involved and that "the amount in dispute, exclusive of costs, exceeds" $7500. This court has appellate jurisdiction. Art. V, Sec. 3, Const., 2 V.A.M.S. p. 31; Davis v. Davis, Mo., 252 S.W.2d 521, 522[1].

We shall refer to the parties, respectively, as contestants and proponents. All section references are to both RSMo 1949, V.A.M.S.

A. C. Donnan died on March 29, 1951. He was survived by: No descendants; his widow, Mary Ellen Donnan; two brothers, contestant Lyman Lee Donnan and proponent David McAnally Donnan; two nephews, sons of a predeceased brother, contestants William V. Donnan and Gerald C. Donnan; and two half nieces, daughters of a predeceased half-sister. Neither the widow nor the two half nieces are parties. Proponent David Alexander Donnan is a son of proponent David McAnally Donnan.

The contested will was executed, published, declared and attested on February 27, 1951 (the date recited therein was February 26, 1951), and was probated on April 9, 1951. The first paragraph directed payment of debts and funeral expenses. The second devised and bequeathed to his wife all of the income for life or until remarriage, with remainder to his brother, David McAnally Donnan, and his nephew, David Alexander Donnan (proponents), absolutely, share and share alike. The final paragraph nominated and appointed proponents executors.

The sole issue submitted below was that of mental capacity. Here, proponents challenge the judgment upon three grounds: The sufficiency of the evidence; error in permitting a witness to refresh her recollection; and contestants' failure to make the widow a party.

A. C. Donnan was over 91 years old when he died on March 29, 1951. He married the instant widow, his second wife, in 1937. Apparently, their married life was a happy and harmonious one. In 1945, he moved to Rolla from Lake Spring, in Dent County, where he had operated a farm. He had

been a director of the Rolla State Bank since 1897 and its president since 1913. He was active in the bank's affairs, was well informed as to securities, including government bonds, and knew real estate values. He was deeply religious. He was positive and strong in his convictions. He was proud of his relatives and (other than the "jealousy" matter hereinafter mentioned) his relations with all of them were close, friendly, cordial and affectionate.

Donnan was a man of strong physique, was physically vigorous for his age and, until September, 1950, had neither been operated on nor hospitalized. He believed in periodical "checks ups,"—especially after 1935 when an examination showed that he had "arteriosclerosis generalized and myocarditis; * * * he was developing hardening of the arteries and * * * weakening of the heart muscle brought on by arteriosclerosis." Donnan had a check up at least every four or five months.

■ Our statement of the evidence, of course, is in the light most favorable to contestants, in whose favor the judgment was entered. Dowling v. Luisetti, 351 Mo. 514, 173 S.W.2d 381, 385[1]. Below, contestants conceded (in their counsel's argument to the jury) that Donnan was of sound mind when he was in Missouri Baptist Hospital, St. Louis, September 12, 1950, and his prostate gland was removed. There was no evidence tending to show that he was not of sound mind when he returned to Rolla on October 25. Between December 5 and 13, 1950, he was again in that hospital for a check up as to the prostate operation.

Donnan's widow was a witness for contestants. She testified that, one morning during Donnan's December 5–13 hospitalization, he asked her to take him to another hospital to see her uncle, and he told her he "wanted to go and eat dinner on Sunday with my sister and brother-in-law," and that "they came over after him but when they got there he said he was too sick, he wouldn't go, and he had just told me that morning that he wanted to go. So he was then becoming confused." She al-

so said that the same morning, while certain "checks" were being made, Donnan complained of being sick.

After Donnan's return from the hospital, Mrs. Donnan said: "Well, he wasn't real sick, only * * * he * * * always complained that he couldn't think and he would often sit with his head in his hands and shake his head and he would say that there was something wrong, he couldn't think * * *. Well, he would say he just couldn't think * * *. Well, I couldn't tell you [how often he complained about his mind not working] because we were just going along from day to day and each day there was always something different, especially all through February, he was just going down the ladder each day."

As a courtesy to Donnan, the December 1950 and the January 1951 monthly meetings of the board of directors of the bank were held at his home. (Too, the day of the December meeting was his ninety-first birthday. The meeting place at the bank was a room on the second floor and, had he attended, he would have had to climb the stairs.) Several of the directors testified that Donnan presided at those meetings and, particularly, intelligently discussed the detailed reports of the discount committee as he had at similar meetings throughout the years. Donnan did not attend either the January annual meeting at which officers were elected (a meeting, according to the directors, required by law to be held at the bank) or the February monthly meeting.

Mrs. Donnan said that, sometime in February, 1951, before the will was executed, Donnan had complained that he couldn't see and couldn't hear, "and then he told me miracles had been performed * * * and he said his hearing and eyesight was back and he got up to the organ and he played, he says, 'I can read the notes without any eyesight.' Well that was true; Alec could read the headlines in the paper without his glasses, but he thought this miracle had been performed, and he said, 'I don't want any notoriety; what would the bank folks think if they knew this miracle had been performed?' * * *

There was just things like that that went on from day to day."

Contestant William V. Donnan said that on or about February 18, 1951, he and his mother and two of her friends came to the Donnan home for a visit. So far as his uncle's health was concerned, "I couldn't figure him out, he wasn't natural, he was sweating, perspiring, was holding his head in his hands and he wouldn't talk with me, seemed very much disturbed. I was incommunicado, he just didn't want to have anything to do with me. * * * He just wouldn't talk." According to Mrs. Donnan, one of the visitors played the organ; Donnan usually enjoyed organ music but "he evidently didn't" that day, "he wasn't in that humor that day, and he came to the kitchen" where she was preparing a lunch; "and he says, 'Got tomatoes today, you have been holding out on me' and I said, 'Well, now, we have been having tomatoes all along * * *.' He went back into the living room, but talked very little to them, he didn't mix in with the conversation that day. * * * I noticed he didn't say very much; after lunch, William V. Donnan said that he and his uncle were going to have a visit while the ladies washed the dishes, but Donnan wasn't in that humor. He just dropped his head in his hands and broke out with sweat; to William's inquiry, 'What's the matter with uncle,' I said, 'Bill, he just isn't at himself, hasn't been for a while.' " Later, Donnan wrote his nephew some sort of an apologetic letter regarding his conduct that afternoon.

One morning "during the latter part of February," Donnan asked proponents' witness Waltenspiel to take some papers and bonds to the bank, have the bond numbers checked and put them in Donnan's lock box. Waltenspiel noticed "nothing wrong" about Donnan. Donnan told him that the night before he had had a heart attack, and "this old ticker of mine is liable to stop most any minute now and I want to get my affairs in shape * * *."

John Bowles, who lived at Lake Spring, and was a son of Donnan's first wife's sister, had known Donnan for over fifty

years. On the night of February 23, Mrs. Donnan telephoned Mrs. Bowles and told her that Donnan wanted Bowles to come to Rolla the next day. Bowles arrived at the Donnan home about 3 p. m., Saturday, February 24. Donnan was "very much depressed because I didn't get there in time to go to the bank for him * * * and I says, 'Uncle, I can come in Monday.' He said, 'John, I may not be here, very bad heart, very bad, I may not be here Saturday or Monday.' * * * I says, 'I will be in Monday and then I will tend to what you want done.'" The following Monday (February 26, 1951, the day the longhand will later mentioned was executed), Bowles returned to Donnan's house. Donnan again referred to his heart condition and told him to go to the bank and get his lock box. Bowles did so and took the box back to Donnan. Donnan opened it, handed some old letters, papers and deeds to Bowles, saying that he thought they might be of interest to him. Bowles said, however, that he was not interested and had not examined them until the day he testified; none of the papers related to any property that Donnan then owned; there was some old deeds to a Dent County farm, once owned by the father of Donnan's first wife and in which, according to Bowles, he (Bowles) would sometime have an interest.

Donnan told Bowles that "things are in an awful shape." He said that he "had a bond that was nonnegotiable, he couldn't collect the interest, he couldn't collect the money, the government had just taken his money and given him nothing that he could collect in any way, shape, form or manner. He told me he was writing a financial article to be published in the paper in regard to the financial condition of the government. * * * He laid some papers out there which were—just had a lot of figures on them and they didn't mean a thing. * * * Now, they didn't mean anything to me; now they may have to Uncle Alec, but I couldn't see that they meant anything." In Bowles' opinion, Donnan was of unsound mind. Proponents' witnesses Albert Waltenspiel and his wife came to the house just as Bowles left. Donnan told Waltenspiel,

"I had John take care of some papers, but they concerned matters at Lake Spring and he knew more about it than anybody he knew of."

The contested will was prepared by W. D. Jones, Donnan's attorney for over forty years. Jones had been told that Donnan wanted him to come to his home and write his will. About 3 p. m., February 26, 1951, Jones and his wife arrived at the house. Donnan told Jones that he had had a "sick spell * * * something like asthma" the night before and wanted a will written; and told him how he wanted to dispose of his property. Jones wrote the will in longhand, read it to Donnan, Donnan said, "That's what I want," Donnan signed and the Joneses signed as attesting witnesses. As Jones was writing the will, Donnan told him to make David McAnally Donnan and his (David McAnally's) son the executors and to spell "McAnally" right, saying "I don't believe you can spell 'McAnally'" and spelled it for him. Donnan approved Jones' suggestion that he take the longhand will to his office and have typewritten copies made.

About 9 a. m. the next day (February 27), the Joneses returned with the typewritten will. The execution and attestation dates were the same as those on the longhand will executed the day before; and the language was identical except: In the longhand will, the brother and nephew (proponents) were named as executors and "as trustees of my wife, Mary Ellen Donnan," whereas the typewritten will did not create such trusteeship. Jones testified that he made the change because, after thinking over what Donnan had told him the preceding afternoon, he believed that was what Donnan really wanted. On neither occasion did Jones expressly call "the trusteeship matter" to Donnan's attention. Jones showed Donnan the typewritten will, Donnan read it and the two discussed it. Jones reminded Donnan that "you have some other relatives that you haven't mentioned." (He said that he gave Donnan the reminder because the afternoon before Mrs. Donnan had told Mrs. Jones: "That will not stand. * * * I don't care what he puts in his will, we

will break it because" he had two nephews whose names he had not mentioned.) Donnan replied that he knew he had not mentioned some of his relatives; that he wanted his property to go as set out in the typewritten will, "That's what I want." Donnan did not show any feeling against the relatives not mentioned in the will and did not mention William V. Donnan's name. Donnan signed and the Joneses attested both the ribbon and a carbon copy of the will. In the opinion of both Mr. and Mrs. Jones, Donnan was of sound mind that morning and the preceding afternoon.

Mrs. Donnan denied saying anything to Mrs. Jones about "breaking the will." She said that, as they were leaving the house on the afternoon of February 26, she told them, " 'Folks, this will—this house is not normal and things will not stand,' * * * and Mrs. Jones said, nodding to Mr. Jones, 'He didn't know that.' " Mrs. Donnan did recall that, either that morning or the preceding afternoon, Jones said something to Donnan about relatives not being mentioned and heard Donnan say that "David [his brother, a propoent] would take care of them" (Jones so testified). In Mrs. Donnan's opinion, her husband "was not mentally competent to make a will" on either occasion.

The evening of the day the will was executed, contestant William V. Donnan and his mother came to the Donnan home. According to the nephew, Donnan said, "It is good you came, I am going to be dead in two days * * *. If you had come two days later, you wouldn't have found me alive. * * * The doctor told me I have got hardening of the brain and ventura of the heart. * * * There's no use arguing about it * * *. I am going to be dead in two days."

En route to St. Louis that night, William V. Donnan stopped and telephoned Dr. Guy V. Everist, Donnan's Rolla physician. The nephew asked what "ventura of the heart" is. The doctor told him that he did not know what Donnan meant by "ventura of the heart," and that, as to Don-

nan's mental condition, "he is very depressed."

Mrs. Donnan testified that Donnan had never "made any charges against" her. On the night of February 27—the will had been executed that morning and William V. Donnan had visited Donnan that evening—after they had retired, Donnan asked Mrs. Donnan: " 'Did Bill Donnan ever make any advances toward you?' I said, 'No, he is your nephew and is like a son and * * * Anna, his mother, is my best friend.' So he didn't say anything more about that then." The next morning Donnan said to her: "I know you will never marry Bill Donnan, I want to give you something," and endorsed and gave her two checks totaling $350 and $20 in cash. (Apparently, Donnan had mentioned the matter before the night of February 27, as, in a letter to William V. Donnan, dated February 26, Mrs. Donnan said: "He (Donnan) is of a jealous disposition, which he seems he can't control, or doesn't try. Now that he is becoming senile is much worse. I hated it the way he treated your company [on the occasion of the visit of William V. Donnan, his mother and two other ladies on February 18]. Next a.m. he ask me the first thing if you had ever made any advances toward me. * * * Ever few days he gets off he don't understand how Bill got such an influence over me. * * * He says he knows you have done more for him & he owes his life to you he doesn't expect to share his wife with you.")

Dr. Everist arranged for the services of Mrs. Smith (then Mrs. Wynn), a practical nurse. Mrs. Smith reported for duty on the evening of February 28. Testifying by deposition, Mrs. Smith said that, before going to bed that night, Donnan insisted on placing a pistol by his bed, as had been his practice for many years; and she later slid the pistol under a chest. About midnight the next night, March 1, "he made a dash out into the living room (where Mrs. Smith was) and he looked at me and said, 'Oh, this is where you are.' I said, 'Yes, is there anything I can do for you?' He

said—he was very wild-looking, and he said, 'Don't you know it isn't safe for me to stay in this house with that woman?' I said, 'What woman do you mean, Mr. Donnan?' He said, 'My wife.' 'Why,' I said, 'Your wife is in bed sleeping (in a room across the hall from Donnan's) and has been for a couple of hours.' 'Oh, you don't know anything about it,' he says, 'she can just come across to my room, and she is going to kill me.' * * * He accused his wife of having his gun—she stole his gun and there was six shots in it, and she was going to kill him. Well, she didn't have his gun, because it wasn't taken from under the cedar chest where I had shoved it. * * * So I tried to pacify him, and tell him that his wife was not going to kill him, she wasn't going to do him any harm whatsoever. But he still insisted. 'Well,' I said, 'I will tell you what I will do.' I says, 'You go back to your bed, and I will go and sit right in your bedroom, and I will see that your wife doesn't come in. I will sit there and watch all night long, and you go and have your rest.' So he went back to bed, and I sat in his room all night * * *." Mrs. Donnan testified that she did not leave her room that night and heard none of the conversation between Donnan and Mrs. Smith.

The next morning (March 2) Mrs. Donnan told Mrs. Smith that Donnan had locked himself in his room. Mrs. Smith went to the door, told Donnan, "This is your nurse" and asked him to let her in so she could make up the bed "before my cab comes to take me home." Donnan asked, "Are you alone?" and, upon Mrs. Smith's assurance that she was, opened the door, let her in "and braced himself against the door"; Mrs. Smith made the bed "and then I had to coax him to let me out and he wouldn't let me out until my cab blew for me. * * * And they came and they blew the horn for me, and I said, 'Mr. Donnan, will you please let me go now? My cab is waiting for me'; and he said, 'Are you sure it is your cab?' I said, 'Yes' * * * so he opened the door * * * and he raced past me and right out the front door and across the yard * * *

and jumped into the cab." Donnan was wearing house slippers but did not have on his coat, overcoat or hat. Although urged by Mrs. Donnan and Mrs. Smith, Donnan refused to leave the cab; he said that he wanted to go to the home of Albert Waltenspiel; the cab driver drove Donnan and Mrs. Smith there; Donnan again refused to leave the cab until Waltenspiel came out and persuaded Donnan to come into the house. In Mrs. Smith's opinion, based upon the pistol incident and his "hallucination" that his wife was trying to kill him, Donnan was "not mentally right."

Mr. and Mrs. Waltenspiel testified for proponents. They and both proponents were at the Waltenspiel home on the morning of March 2. Waltenspiel said that after Donnan came in he "was very much excited at first" and said, "I don't want to go back over there. * * * They will hurt you * * * if you go over there." Within twenty or thirty minutes "he just seemed to calm down and be just his normal self again." In Waltenspiel's opinion, Donnan was then of sound mind "except that one aberation there when he first came over, but after he once got that idea out of his head he said, 'I know I am amongst friends now, I feel perfectly safe,' and he calmed down after the first half hour * * *." Q. Would you say that during that first half hour that he was a person of unsound mind on March 2d? A. Well, he had this one overpowering idea." Waltenspiel knew of no reason why Donnan should have that one idea, "because I never seen Mrs. Donnan but what she was doing a wife's duty to him. I don't see how he got that idea, but he did." Donnan had never before told Mrs. Waltenspiel or anyone else so far as she knew, that Mrs. Donnan "was going to kill him. * * * Q. Did you ever hear him say anything about anything that to your mind was a delusion on his part? * * * A. Well, that morning over at our house when he seemed to feel insecure at home." Before that event she had never heard him "say anything that sounded like he was reciting a delusion, something that didn't exist."

324

Proponent David McAnally Donnan testified that when Donnan came into the Waltenspiel home that morning, "he seemed very excited," but later "seemed to quiet down * * *. I think at first he said something about having to get away from * * * his house. * * * He quieted down in about a half hour. * * * He told me not to go over there (the Donnan home); * * * he indicated it wasn't safe for me to go over there * * * I might be harmed over there."

Dr. Everist contacted Dr. Joseph E. Carney, Donnan's St. Louis doctor, who made arrangements for Donnan to re-enter Missouri Baptist Hospital that night. Proponents drove Donnan to St. Louis that afternoon. Mrs. Donnan and Mrs. Smith followed in another car because Dr. Everist had told Mrs. Donnan to "keep out of Mr. Donnan's sight."

Dr. Carney testified that he first met Donnan in 1935, and had been "taking care of him since." In 1935, Donnan "came in for a general physical check up. * * * I diagnosed it (Donnan's ailment) as arteriosclerosis generalized and myocarditis. * * * Arteriosclerosis means he was developing hardening of the arteries, and myocarditis means weakening of the heart muscle brought on by arteriosclerosis." Dr. Carney visited with Donnan when he was in the hospital in September–October, 1950 (the occasion of the prostate operation). He next saw Donnan on March 3, 1951, the day after he was brought back to the hospital. "He told me they had brought him up there and put him in the hospital to get him away from home, they wanted to get rid of him, wanted to do away with him; * * * he said they were after him, they were trying to kill him and that his—one of his relatives was trying to have an affair with his wife. * * * I believe it was Bill Donnan, his nephew * * * and they were trying to take everything he had away from him; he said he believed I was in cahoots with them or I wouldn't have him locked up in the hospital."

In Dr. Carney's opinion, Donnan's trouble was "cerebral arteriosclerosis or softening of the brain or senile dementia, whichever one you want to term it, all three meaning the same." Softening of the brain results from hardening of the arteries. Asked, "How long would you say that that softening of the brain had been going on before you saw him on the 3rd of March, 1951," Dr. Carney said: "Well, hardening of the arteries is a very gradual progressive condition and no one would know how long prior to that time, maybe several years. Q. Well, now, this softening of the brain condition that you found existed there on the 3rd of March, 1951, would you say that condition had obtained for some time before that date? A. Yes, most likely it had, because he had diagnosis of generalized arteriosclerosis made on him in 1935. Q. How long would you say that this softening of the brain existed before March 3, 1951? A. Oh, several days at least."

Dr. Carney said that mental delusions are, and are recognized as, symptoms of softening of the brain and of an unsound mind; some such symptoms are: "They usually think their friends have turned on them, they usually think someone is trying to do them bodily harm, they usually have ideas of infidelity." Mental delusions indicate a "brain that is absolutely abnormal; * * * it could be an unsound mind." Dr. Carney said that, on March 3, 1951, he found Donnan having these mental delusions: "Mr. Donnan thought someone was trying to kill him, he thought his nephew was trying to have an affair with his wife, or that his wife was unfaithful to him; he and I had been very good friends and he accused me of being in the scheme with them."

"As a rule," Dr. Carney said, "conditions resulting from generalized arteriosclerosis and myocarditis grow progressively worse; the only exception is the rapidity of the process"; everyone has some degree of it after a certain age, and "that doesn't mean that he is mentally incompetent." However, Donnan was mentally incompetent on

March 3, 1951, and thereafter his condition progressively became worse. Dr. Carney advised "that he be put in some mental institution * * * where he could receive treatment from a specialist in mental diseases." Because Donnan had "tried to run out of the room several times," Dr. Carney suggested that he be removed to Ward A, the "locked" ward for violent and unmanageable patients. Donnan was transferred to that ward on March 5.

Mrs. Lelah Vought was Donnan's nurse his first three nights in the hospital and his first night in the psychiatric ward (March 2, 3, 4 and 5). She testified that, on March 2, she was told that "he was a mental case and that I was at no time to leave the room unless some nurse was in there with him"; that he told her his wife had tried to kill him and he had to get away; that he talked about his mental condition, saying, "I know sometimes I am confused and don't know what I am doing but right now I am perfectly clear," and told her that the afternoon nurse was going to kill him; that he "had a nurse at Rolla, just before he came to the hospital, and she was going to try to kill him, too"; that he had been "arrested and brought there to the hospital," and that as soon as he got out he was "going to have a law passed that no one could be arrested and put in the hospital." He did not seem to realize he was in the psychiatric ward.

Mrs. Birdie Walsh attended Donnan on the 7 a. m.–3 p. m. shift, March 3, 4, 5 and 6. She testified that he told her: His wife was going to kill him and he was "scared of her"; he realized at times that his mind was not right; he was afraid the women in the kitchen would put poison in his food; Dr. Carney had him arrested and sent him to the hospital, and he was going home and have a law passed that they couldn't arrest patients and take them to hospitals.

Mrs. Dorothy Cross attended Donnan on the 3 p. m.–11 p. m. shift March 6, 7 and 8. She testified that Donnan refused food saying that it was poisoned, told her that his wife would try to kill him and "he was afraid of her and didn't want to be with her alone, and as long as he was at home with her they would have to be alone, and that he carried a gun and it was loaded, and he made it emphatic that he wanted to impress on me that it was a loaded gun and that one night he jumped out the window and the cab had driven up next door or across the street and he didn't know which, but he jumped in this cab and went to his brother's * * * in order to get away from his wife. * * * He seemed to have an idea that there were someone stealing the money (at the bank) or someone had stolen the money and he wanted to get back out to protect the money for the citizens that had trusted him as a banker. * * * He spoke more of Bill Donnan than he did of anyone, even including his wife, and he always spoke well of Bill, said he had always been a good nephew to him, in fact, had been as a son, and if he had had an own son he possibly couldn't have been better, and he doubted if he would have been as good as Bill would have been to him."

Miss Marian Zeno was Donnan's nurse on the nights of March 7–16. She testified that Donnan frequently told her he was very much afraid of his wife because she had been trying to kill him; that he objected to taking medicine and food because he was afraid it was something that would kill him; and that there were explosives under his bed. In her opinion, Donnan was of unsound mind during the entire ten-night period.

Proponent David McAnally Donnan often visited his brother at the hospital after March 2. "At times he seemed perfectly fine and alright and at other times he seemed to be off somewhat. * * * He would say himself that he had these mental aberations, I believe you call them—he says, 'I was in one of those and now I am alright,' and he would do and talk very sensibly and normally, and at other times he had these spells and he wasn't so good. * * * And that kept up; * * * he seemed to be getting worse" until March 17, when Donnan was removed to the McFarland Home (for the aged) at Rolla.

At the McFarland Home, Donnan was violent, broke furniture and threw his mattress and bed clothes on the floor. He did not recognize a male attendant whom he had known for twenty-five years and had helped secure an appointment as deputy sheriff. He claimed "someone was trying to get all his money," and repeatedly introduced himself to the nurse as the president of the Rolla State Bank. As stated, he died on March 29, 1951.

Dr. Everist's check up of Donnan in September 1949 showed that Donnan had hardening of the arteries. Dr. Everist agreed with Dr. Carney that "once a person had hardening of the arteries, it grew progressively worse. * * * The hardening of the arteries is irreversible, that is, never gets any better * * *." In Dr. Everist's opinion, the condition in which Donnan was has an effect upon a man's brain and mind; that condition is a common cause of softening of the brain because, as it progresses, the brain gets less proper nourishment and it reacts by being less able to carry on its function. Dr. Everist had no way of knowing whether Donnan had softening of the brain. In his opinion, he had senile dementia which could be caused by softening of the brain. His clinical diagnosis of Donnan had been "senile dementia secondary to generalized arteriosclerosis and, more specifically, hardening of the arteries within the brain itself." Donnan's condition, in the doctor's opinion, affected his brain.

Donnan consulted Dr. Everist several times during 1950. (It was Dr. Everist who recommended the prostate operation.) Dr. Everist said that when he called at the Donnan home on February 23, 1951, Donnan had "a lot of delusions, particularly delusions of persecution. * * * He said he couldn't trust anybody, I mean with anything * * * and that he had knowledge that people were trying to get him and it was necessary for him to have a gun around. * * * He said, 'I have had it for years, but I am glad I have got it.'" Dr. Everist's conclusion was that Donnan's trouble was mental, not physical. When the doctor saw Donnan again on February 27,

Donnan was depressed and did not carry on the sort of general conversation that he had on previous occasions.

Dr. Earl Feind (proponents' witness), Rolla physician and bank director, had not seen Donnan between January 5 (the date of the monthly board meeting) and sometime in March when Donnan was in the McFarland Home. At the latter time, Donnan was "mentally deranged, definitely a mental case." Dr. Feind agreed with Drs. Carney and Everist that hardening of the arteries become progressively worse and causes softening of the brain. In a majority of cases, if a man lives long enough, there will be a point where softening of the brain results in mental derangement. The doctor could not tell just where that point would be, "I know of no criterion to go by," but "those things may come rather suddenly"; and he knew of "no way of telling what happened after January 5"—Donnan may have reached that point any time after that date. In Dr. Feind's opinion, these hypotheses were definite proof of a deranged mind: Donnan's belief that his wife was trying to kill him and that he had to have a revolver to protect himself; his belief that he was the victim of a conspiracy; his belief that the nurses were trying to kill him, that his food and medicine were poisoned and that there were explosives under his bed. And Donnan's "repetition of the fact, over and over again," that he was president of the bank indicated some mental disturbance. However, Dr. Feind said, in instances of mental delusions, or senile psychosis, the patient has lucid intervals, and may have delusions on one day and on either a prior or later day not have delusions; and it is possible one might have delusions of persecution and yet be able to handle his business affairs unless the delusions are "persistent," that is, have become "a permanent derangement, generally speaking."

"If there is any substantial evidence to support the verdict and judgment [against the will], we are not authorized to set them aside. * * * The question is as to mental capacity at the time of the execution of the will. * * * Evidence as to men-

tal condition both before and after the execution of the will is admissible. * * But such evidence is of no probative value unless it raises a reasonable inference as to mental condition at the time of signing the will." Whitacre v. Kelly, 345 Mo. 489, 134 S.W.2d 121, 124[1–3].

In Hall v. Mercantile Trust Co., 332 Mo. 802, 59 S.W.2d 664, 669–670, it was said: "Insane delusions constitute a species of mental incapacity or unsoundness of mind in will contests. A person may possess sound mental faculties generally and yet be deranged or abnormal in some particular respect. One may be of sound mind generally and yet be possessed of an insane delusion on one subject or as to one fact. * * * As we understand the law, the delusion which makes a testator incapable of making a will must be a delusion as to or affecting some matter necessarily involved in the making of a will, and not as to some extraneous or collateral matter or fact. * * * One of the requisites of a sound mind in making a will is that the testator is able to remember and appreciate the natural ties of kinship, and, if it be shown that a person making a will is possessed of an insane delusion as to any person who is the natural object of his bounty, rendering him incapable of appreciating and responding to the natural impulse, then such person is incapacitated to make a will. * * * It seems to be well settled that wills may be set aside on the ground that, while the testator is mentally capable in other respects, he is possessed of an insane delusion as to some matter involved in the making of the will."

■ In the instant case, there was substantial evidence from which the jury could reasonably infer that: Both shortly before and shortly after Donnan executed his will on Feburuary 27, he had mental delusions that his wife was trying to kill him and that his nephew, contestant William V. Donnan, had "made advances toward" Mrs. Donnan; and that he had those delusions at the time he executed the will. (Both the wife and this particular nephew obviously were "involved in the making of

the will.") We hold that contestants made a submissible case.

Proponents allege error in permitting Miss Zeno, contestants' witness, to refresh her memory from a typewritten memorandum (prepared by contestant William V. Donnan), purporting to contain copies of notes she entered in the hospital records when she attended Donnan. After qualifying Miss Zeno and showing that she was his night nurse March 7–16, contestants' counsel stated: "Miss Zeno, if you have any notes about your record and about the times and places that were made at the time, you have a right to refer to them." There was no objection. Miss Zeno then testified (apparently, so far as the transcript shows, without referring to the memorandum) without objection, that "quite frequently" Donnan told her that his wife was going to kill him and that he was very much afraid of her. Later, however, proponents' counsel objected to the witness referring to the memorandum and the objection was overruled. According to the transcript, Miss Zeno thereafter referred to the memorandum but once. She had testified that one night Donnan told her that there were explosives under his bed; that he did not say it on the first night (March 7); that (referring to the memorandum) it was "on the night of the morning of the 11th. Thereafter, upon cross-examination, Miss Zeno stated that (while "her thought and best judgment" was that, as to entries made by her, the memorandum was "approximately correct and perhaps entirely so"), she did not make the memorandum, did not see it made and had not compared it with the original records.

■ Proponents contend that they were prejudiced by Miss Zeno's use of the memorandum (after their objection was overruled) to fix *the precise date* of Donnan's statement about explosives. However, whether Donnan made that statement on the night of March 7 or March 10 (or any other of the eight nights Miss Zeno was his nurse), under the evidence in this case, was of no importance. Proponents have not shown, and we are unable to perceive,

wherein, under the circumstances, testimony as to the particular night Donnan made the statement was prejudicial to them. Thus, any error in permitting the use of the memorandum was not sufficiently prejudicial as to require reversal. Sec. 512.160.

Proponents contend that as the widow, a beneficiary in the will, was not a party, the judgment was void. They rely upon Kinsella v. Kinsella, 353 Mo. 661, 183 S.W.2d 905, 907[4], wherein we said: "True, under our statutes plaintiff [contestant] must make all beneficiaries named in a will parties to a will contest in order to get a valid judgment setting the will aside. If any beneficiary is not made a party a judgment setting the will aside is invalid not only as to the omitted party, but as to all parties and the question can be raised by any proponent for the first time on appeal."

Contestants' position is that the widow was not a necessary party because she had, prior to the filing of the suit, exercised her statutory rights of election (those of a widow of one not survived by descendants, Sec. 469.110) and of a renunciation of the will (Sec. 469.150). Mrs. Donnan testified:

"Q. While we are on that point, Mrs. Donnan, I believe that you have renounced this will that we are now contesting, have you not? A. I have.

"Q. And you have elected under the law to take what the law gives you independent of this will? A. That's right.

"Q. And are you any longer interested in the outcome of this lawsuit—does it make any difference to you who wins or who loses so far as financial interests are concerned? A. No, not as far as one—

"Q. Well, I say, you won't get any more or won't get any less? A. I won't get any more or any less, I will get my part. That is the privilege of a wife.

"Q. However this lawsuit will be decided it won't affect you financially? A. That's right."

We do not construe the above-quoted, broadly-stated rule of the Kinsella case, supra, as applicable to *every* judgment setting aside a will, or as *invariably* requiring the joinder of a named beneficiary in a contest resulting in such a judgment. The purpose of that rule is to afford the beneficiary an opportunity to appear for the purpose of protecting his or her interest under the will and of supporting and defending the writing upon which his or her interest depends, and to have all necessary parties bound by the judgment. Here, the beneficiary appeared as a witness and testified that she had renounced, and was asserting no claim or interest under, the will.

Proponents contend that: As the only evidence as to Mrs. Donnan's renunciation and election was her own statements, and as original or authenticated copies of probate court records showing her renunciation and election were not put in evidence, there was no competent evidence as to her renunciation and election. Mrs. Donnan's oral statements constituted some evidence that she had renounced and elected. Her above-quoted testimony was given without any objection by proponents, and proponents did not at the trial even suggest that she had not validly renounced the will. In our view, Mrs. Donnan's testimony, although not the best evidence, was, insofar as necessary for our determination of the matter, sufficient.

We hold that, under the instant circumstances, Mrs. Donnan was not a necessary party.

The judgment is affirmed.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by LOZIER, C., is adopted as the opinion of the Court.

All concur.