**Werdna McKee HARDY, Plaintiff-Appellant,**

**v.**

**Pauline BARBOUR and Una Thornburgh, Co-Executrices, Una Thornburgh, Pauline Barbour, Clyde Owens, Ina Leyerle, Bess Robertson, Norvill Jezzard, Ada Ellis, Rita Bruer, Nell Law, Mrs. Carl Thomas, Joe McKee, Rose McKee, and Alice Puryear, Defendants-Respondents.**

No. 45361.

Supreme Court of Missouri, Division No. 1.

June 10, 1957.

Opinion Modified on Court's Own Motion

July 8, 1957.

Motion for Rehearing or to Transfer to Court en Banc Denied.

July 8, 1957.

Horace S. Haseltine, Harold T. Lincoln, Lincoln, Lincoln, Haseltine, Forehand & Springer, Ralph E. Hunt, Springfield, Erwin C. Hartman, Thomas J. Guilfoil and Hartman & Guilfoil, St. Louis, for appellant.

Haymes, Dickey & Dickey and Barbour & Patterson, Springfield, for respondents.

DALTON, Judge.

This is an action to contest the will of Grace Thompson McKee, deceased, whose alleged will was probated in common form by the Probate Court of Greene County on January 25, 1954. Plaintiff (contestant) is testatrix's only child, a daughter, who was bequeathed the sum of one dollar. The balance of the estate having a value in excess of $32,000 was, for the most part, devised and bequeathed to persons wholly unrelated by blood or marriage to testatrix. Verdict and judgment were against the will, but the trial court sustained defendants' (proponents') after-trial motion for judgment in accordance with defendants' motions for a directed verdict made at the close of all the evidence. The court entered judgment probating the will in solemn form and, in the alternative, sustained defendants' motion for a new trial on the ground of error in the giving of plaintiff's instruction No. 1. Plaintiff has appealed.

Before reviewing the evidence, it will be necessary to state some facts concerning the theory upon which this cause was tried and submitted. The original petition charged that the purported will was the result of (1) undue influence; (2) testamentary incapacity; (3) an insane delusion that plaintiff was the cause of testatrix' divorce; (4) an insane delusion that plaintiff had conspired to have testatrix committed to an asylum for the insane; and (5) an insane hatred, strong aversion, dislike, anger and ill will toward plaintiff, her daughter.

The transcript of the record, approved by counsel for appellant and respondents, shows that "the petition upon which the case was tried" contained paragraph 14, which charged that at the time said paper writing was executed Mrs. McKee (hereinafter referred to as testatrix) was "dominated and controlled in said action by an insane hatred for this plaintiff, that said insane hatred for her only child was not founded on reason; that said paper writing was the product of said insane hatred; that said insane hatred was encouraged and unduly influenced by the defendants." The transcript also shows that, on motion of defendants, the trial judge struck out paragraph 14 of the petition on the ground "that the mere allegation that testatrix was dominated and controlled by an insane and unnatural hatred of plaintiff, which was encouraged and unduly influenced by the defendants is insufficient to allege either an 'insane delusion', or 'undue influence' upon the testatrix as to the disposition which she made of her property." No amended pleadings were filed. The answer filed by defendants makes no reference to the allegations of paragraph 14.

Thereafter, after a change of judge, the cause proceeded to trial and counsel for plaintiff, in his opening statement without objection stated: "The evidence will show that (testatrix) instead of seeing her child she saw a grotesque phantom, and that it was a delusion at the time. The evidence will show that at the time this instrument was executed she was controlled and dominated by an insane hatred, and delusion which she had had for twelve years, and which progressively grew worse down to the time this instrument was executed, and even grew worse after that time down to the date of her death. * * * The evidence will show that Grace McKee from that point developed a cold, cruel, bitter and insane hatred for her daughter, and one which progressively became more bitter and more cold, and deeper, down through the years. * * * The evidence will be that on her deathbed, she said 'Werdna is my bitterest enemy, my only child is my bitterest enemy.' And the evidence will show that she said, if she died, she didn't want them to let her daughter 'walk in to see my dead body.' The evidence will show that she became so deranged and warped in her bitterness toward her only child that she said, 'I never want to see you again in life or in death.' And she didn't mean just alive, she meant death. And she did

everything she could to see it was carried out." Counsel further reviewed the evidence in support of this position.

Defendants also made no objection to a statement by the trial judge early in the trial, as follows: "The only pleading of delusion in this case is that the testatrix believed her daughter conspired to send her to an insane asylum. That's the charge in the petition—one. Another was that she had incurred an intense hatred against her daughter. That was another allegation."

At the close of all the evidence defendants moved for a directed verdict as to each of four grounds, to wit, that the evidence was insufficient as a matter of law to sustain the allegations of the petition as to (1) undue influence; (2) want of testamentary capacity; (3) insane delusion as to cause of the divorce; and (4) insane delusion about commitment to asylum. The motion was denied. Defendants also offered withdrawal instructions as to the four mentioned assignments and the court gave the withdrawal instructions relating to undue influence and an insane delusion as to the cause of divorce.

With reference to the issues submitted to the jury, plaintiff-appellant says: "Plaintiff's case was submitted on three issues; (1) testamentary incapacity; (2) *insane* hatred; and (3) an insane delusion that plaintiff had entered a plan to place testatrix in an insane asylum"; and that "the evidence is more than sufficient on every-one of these issues." (Italics ours). Appellant's brief admits that paragraph 14 of the petition was stricken on motion, but appellant contends that the court, "thereafter, in substance, nullified and rescinded said order as (is) fully shown by plaintiff's opening statement * * * and the court's actions in that during the trial the court permitted introduction of evidence on said allegation without objection or limitation on the part of the defendants; and thereafter both plaintiff and defendants submitted instructions upon said allegations and evidence * * *."

Respondents' position is that assignment (2) "insane hatred" was submitted to the jury and that such issue is not supported by the pleadings; and that none of the assignments submitted are supported by sufficient evidence to justify submission to the jury.

The court, at defendants' request, did give an instruction to the effect that plaintiff's cause was submitted on three grounds, to wit, (1) testamentary incapacity; (2) an insane delusion that her daughter had conspired to have her committed to an insane asylum; and (3) "that at the time she executed the instrument in question, Grace McKee was dominated and controlled by a strong aversion, dislike, anger, ill will or hatred toward her daughter without cause or reason."

Defendants also requested and the court gave an instruction on "the third of the said alleged grounds * * * that even though you believe from the evidence that at the time she executed the instrument in question she was dominated and controlled by a strong aversion, dislike, anger, ill will or hatred toward her daughter, nevertheless, if you believe from the evidence that such feeling, if any, on her part had cause or reason sufficient to satisfy her mind for not giving to the plaintiff more than one dollar of her estate, and if you find that Grace McKee was capable of reasoning and did reason to the conclusion that her daughter did not deserve any more of her estate or that she did not want to give her daughter any more of her estate and that she wanted to give her estate to the persons named as beneficiaries in the instrument in evidence, and that such conclusion was not the result of an insane delusion, as defined in other instructions, then your verdict will be for the defendants and in favor of the will on this issue."

We find no reference in plaintiff's instructions to *insane* hatred and we have concluded, as hereinafter stated, that the cause was in fact submitted on only two grounds, to wit, (1) testamentary incapaci-

ty, particularly as related to the ability of testatrix to consider, weigh and appreciate the deserts of her daughter and her natural obligations to said daughter; and (2) an insane delusion that plaintiff had conspired to have her committed to an insane asylum.

Appellant contends that she made a case for the jury on all issues submitted and that the court erred (1) in sustaining defendants' after-trial motion for judgment in accordance with defendants' motion for a directed verdict for defendants made at the close of all the evidence; (2) in setting aside the verdict of the jury; (3) entering judgment for the probate of the will in solemn form; and (4), in the alternative, granting defendants a new trial.

The transcript of the record in this case contains 1,186 pages. Some 125 exhibits were offered. Only a comparatively brief review of the evidence is possible in this opinion. We shall state the evidence favorably to plaintiff, who obtained a favorable verdict, and we shall disregard defendants' evidence unless it aids plaintiff's case. Outstanding conceded facts will, of course, be stated. Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135, 141. On the issue of whether or not plaintiff made a case for the jury on either of the issues submitted we shall give plaintiff the benefit of all the favorable evidence shown by the record and all favorable inferences therefrom. Thomas v. Thomas, Mo.Sup., 186 S.W. 993, 994; Taveggia v. Petrini, 352 Mo. 400, 177 S.W.2d 513, 516; Fowler v. Fowler, 318 Mo. 1078, 2 S.W.2d 707, 709.

■ Defendants, as proponents, offered evidence of the due execution of the will and evidence tending to show that at the time the will was executed testatrix was of sound mind and possessed testamentary capacity. This evidence shifted to plaintiff-contestant the burden of going forward with the evidence and producing substantial evidence of testamentary incapacity and the insane delusions, as alleged. Wipfler v. Basler, Mo.Sup., 250 S.W.2d 982, 989(18);

Morton v. Simms, Mo.Sup., 263 S.W.2d 435, 442(9).

By her will, dated April 10, 1952, testatrix left her property, including diamond rings, personal jewelry and effects, to various women friends and to a cousin of her deceased former husband, except for $1 which was bequeathed to plaintiff, her only child. The will recited that this $1 bequest to her daughter was "by reason of her very large inheritance from her father, John C. McKee."

Testatrix died January 21, 1954, at the age of 68 years. The will was probated January 25, 1954. A prior will, dated July 14, 1941, executed after the death of John McKee and prior to the opening of his will, had given plaintiff $50 and assigned the same reason therefor as the will executed in 1952. Testatrix' estate consisted of real and personal property of the appraised value of $34,307.28.

Testatrix was born in Arkansas and was married to John McKee at Jonesboro, in 1905. The parties subsequently removed to Springfield in 1918, where Mr. McKee was an agent for the National Cash Register Company and, after 1926, he was president of the Missouri Home Savings and Loan Association in Springfield, until the time of his death in 1941. In 1939, testatrix instituted a suit for divorce against her husband, but on trial divorce was denied. Thereafter, the parties made a property settlement and an uncontested divorce was obtained by testatrix in May 1940. After the divorce testatrix, for most of the time, continued to live in the family home in Springfield, until her death in 1954, although for certain periods she acted as house mother for a sorority in Indiana and, later, in Arkansas. Testatrix' divorced husband was killed in an automobile accident in July 1941 and testatrix' prior will leaving plaintiff the sum of $50 "by reason of her very large inheritance from her father" was executed the day that plaintiff brought her father's body into Springfield for burial.

Plaintiff offered no conflicting evidence with reference to the formal execution of the will in question here. Plaintiff's evidence is chiefly directed to the relationship between testatrix and the members of her own family. Little, if any, evidence was offered by plaintiff in conflict with defendants' evidence tending to show that testatrix was quite active in the social life of Springfield both before and after the divorce from her husband; that she belonged to and attended a number of clubs and social organizations and had her own circle of friends. The evidence shows that, to the public and to her friends, testatrix appeared to be an alert, intelligent and friendly person, interested in her home, her flowers and her automobile; that she was a fluent conversationalist, dressed well and made a fine appearance; and that she seemed to be a sweet, kind, gentle and gracious woman. Other evidence tends to show that she was a beautiful woman and a wonderful hostess; and that she was very congenial, poised, and always perfectly groomed and a pleasant and interesting talker. She was considered very handsome, a charming and spritely woman. In 1935, plaintiff wrote of her mother: "Now mother is attractive and sweet. She makes a nice appearance and is liked by people. She has her faults, but we all have."

Many of defendants' witnesses, who knew testatrix well, testified that she seldom or never mentioned her daughter and hadn't for many years. One said that in thirty years she didn't recall testatrix speaking plaintiff's name. In addition to handling her own property, maintaining her own home, and at different times working as sorority house mother, testatrix visited and took trips with friends, some for long distances. Much of plaintiff's own evidence tends to confirm rather than contradict this evidence concerning testatrix' relationship to the public generally. It appears that testatrix at all times had her own separate real and personal property and managed it.

Before reviewing the evidence concerning the relationship between testatrix and plaintiff, we may say that the evidence shows that plaintiff, testatrix' only child, was born August 4, 1907; that she attended grade school and high school and one year at Drury College in Springfield and obtained her A. B. degree at Washington University in St. Louis. She taught school for two years in Springfield and then worked as a buyer for a department store in St. Louis. In the spring of 1932 she returned to Springfield until the fall of 1933, when she returned to St. Louis and worked at different employments. In 1939 she taught at Lindenwood College at St. Charles and later taught at Washington University. In September 1941, she married Clark Hardy and continued to live in St. Louis and vicinity, teaching and doing substitute teaching until her mother's death in January 1954.

The record shows that testatrix, also an only child, had had trouble with her own mother, who had made her home with testatrix for many years; that, in 1933, testatrix tried to and did put her mother out of the home. Testatrix' own handwritten account of this difficulty was excluded from evidence on the ground of remoteness and no error is here assigned on its exclusion. The evidence admitted does show that testatrix and plaintiff began to have difficulties at about this time and plaintiff testified that her mother's mental illness dated from this period. For the next ten years, letters of testatrix in evidence show references to her difficulty with her mother, such as, "the ugly sorrow over my mother" and "mother's and my trouble" and other references. Many inconsistencies appear in the correspondence, which as plaintiff testified, "things that didn't make sense." In 1941, testatrix wrote about using her own father's money to support her mother and in 1942 she wrote about borrowing money from her mother to send plaintiff to school.

In 1933, and after the death of testatrix' mother, testatrix started going into periods

of long depression, she was very depressed, and she would go to bed and cry a great deal and require the care of practical nurses. In this period she threatened suicide for the first time and felt the local doctors didn't know what was wrong with her. She also visited plaintiff in St. Louis. At this time plaintiff became convinced that testatrix was mentally ill, because testatrix had learned to smoke and drink on a trip to Florida and told of dating a man. Plaintiff also noted a marked change in her behaviour, so that it was entirely different from anything plaintiff had known of her before.

About this same time, after testatrix and plaintiff began to have difficulties, testatrix discussed with plaintiff the matter of cutting her out of her will. Testatrix purported to read to plaintiff an old will wherein testatrix had left everything to plaintiff and a new will wherein plaintiff was left out entirely. A cancelled will, dated September 8, 1921, was in evidence which made provision for testatrix' husband, daughter and mother. A memorandum on the envelope containing the cancelled will recited that a new will was drawn December 17, 1934. A will dated in 1934 was also in evidence which made provision for testatrix' husband and daughter and certain relatives. It was marked void March 12, 1939. A cancelled will dated July 14, 1941, was in evidence and it made provision for certain friends and left contestant $50, as hereinbefore stated.

As early as the summer of 1937, testatrix told the maid in the home that she didn't want a daughter, she wanted a boy, and when plaintiff was born, she wasn't going to change the name, so she turned the name backward and that was the reason for the name "Werdna." After about 1934, testatrix would not let the maid clean plaintiff's room. She would lock the door and not let the maid enter and would say "She can clean it herself." She also refused to let the maid wash plaintiff's clothes. When plaintiff would be leaving home, testatrix would say she didn't want her there, and she was glad she was going; and when she was gone, she was glad she was gone. She also told the maid: "I never wanted her."

In 1934, plaintiff wrote to her father to the effect she felt her mother was neurotic and her mother opened the letter, considered it ugly and became quite bitter about it. Testatrix then wrote plaintiff not to come home for Christmas, that she didn't want her. In the summer of 1935, testatrix and her husband gave plaintiff a small house in Springfield. When plaintiff took the deed to her mother to be signed, testatrix signed but complained to plaintiff and said: "Taking it away from me to give to you." In the summer of 1937, while plaintiff was in Springfield, testatrix was having a great many depressions, spending a great deal of time in bed crying, and again threatened suicide a time or two. She had threatened suicide many times.

In the summer of 1937, testatrix found a letter from another woman in her husband's office desk and she consulted an attorney and investigated her husband's financial condition. On September 8, 1937, testatrix demanded that her husband enter a written agreement with her. The agreement is referred to as the "treaty." She required her husband to sign it or she would divorce him and he agreed to sign it. She dictated it and he wrote it in plaintiff's presence. One part was signed by the wife and the other by the husband. By the agreement they were to live in the home, the husband was to take care of the regular expenses of the household and give his wife an allowance for personal expenses and each were to be privileged to entertain or be entertained by the opposite sex and go and come at their own pleasure and no questions were to be asked. The following morning, after the agreement was signed, testatrix made an amendment in her own handwriting that there would be no "marital relations" and the document was propped up on the husband's chest of draw-

ers. Testatrix was very much pleased with the documents. Plaintiff had had nothing whatever to do with the execution of the "treaty." The parties lived under the "treaty" for about six months, until the end of March 1938. Plaintiff had returned to St. Louis and both parents then began to write to her concerning their troubles, but plaintiff was ill and nervous and she asked them not to write to her about their difficulties. Her father quit, but testatrix continued to write about her marital troubles. In July 1938, she wrote plaintiff about finding other letters from other women in her husband's desk and enclosed them for plaintiff's inspection. Testatrix' letters about her marital troubles didn't stop for years. Numerous letters written by testatrix were in evidence. The letters tended to show a determined effort to alienate the daughter from the father. They were always abusive of him, blackening his character and indicating his lack of interest in his daughter and that there would be no money for her. For example: (1) "Nobody could be meaner than your father." (2) "He is ugly and mean all the time." (3) " * * * aggravated by whiskey and women * * *. His sin, self-reproach not admitted of course with no way out has put him in a place he has never been in before. I liken him to an old octopus with all legs cut off but one & that his little bit of money, struggling to live. It is a *sad sad* story." (4) " * * * Your father's attitude toward you & me is to spend his money and that he is doing fast. There will be little in the end from things as they look now. I sincerely advise that you waste no time fitting yourself to look after yourself." (5) " * * * He said he & you could never be where you once were. * * * He says Aunt Sallie cares nothing for you since he told her of your actions." Plaintiff avoided as much as possible the difficulties between her parents. A divorce suit was impending and each parent was trying to gain plaintiff's support. Testatrix wrote plaintiff in November 1938, "Never advise another man to step out with women," but plaintiff had never advised her father to go out with other women. In December 1938, testatrix asked concerning plaintiff's Christmas plans and said: "I solicit you that we might be closer together, you solicit your father that you two may make up—but never has it been or ever will be that either of you solicit me." In February 1939, testatrix wrote plaintiff accusing plaintiff's father of an illicit relationship with Aunt Sallie, a 73 year old woman, the widow of an uncle of testatrix, and she again accused plaintiff as follows: "And to think my own child talked against her own mother to this type of woman and told her Dad to step out." Other letters followed to the same effect.

Plaintiff was having trouble with her nerves, but was trying to teach at Lindenwood and testatrix was writing frequently two letters a day about her difficulties with her husband. Plaintiff asked her mother many times to quit sending letters about her father and leave her (plaintiff) out of their troubles. In April 1939, testatrix asked plaintiff to testify for her in the divorce suit and plaintiff replied that she was going to remain neutral. She had told her father the same. In May 1939, testatrix wrote plaintiff that she was right in remaining neutral, but that her father would spend his money on himself or marry again and spend his money on the new wife. The same idea was conveyed in many letters. Testatrix later tried to get plaintiff to admit that her father was "the awfullest man that ever lived," but plaintiff refused to agree.

Plaintiff tried to get her parents to make a property settlement rather than try the divorce case, but testatrix said she wasn't after her husband's money, she wanted to ruin him and drive him out. She belittled plaintiff and said she was prettier, had more personality, was superior, had a better figure and disposition and was smarter and had more friends than plaintiff. She repeatedly accused plaintiff of turning her husband against her, but plaintiff had not done so. Letters written by testatrix in July 1939, evidence bitterness that plaintiff was re-

maining neutral in the divorce proceeding. Testatrix said she would not be obligated to plaintiff; and that her father should repay plaintiff ten fold. She also suggested again that plaintiff would never get anything from her father, as his second wife would see to that. Later she wrote "Did you know your father has borrowed money on his life insurance policies made out to you?" It was also suggested that her father would cut her off with $1.

In December 1939, after testatrix was denied a decree of divorce, she wrote plaintiff in effect accusing plaintiff of bad advice, of bad judgment and blaming her with the denial of a divorce. Plaintiff resented the false accusation and a controversy developed in the correspondence as to what had happened in connection with the divorce trial and what had been said and done beforehand. Testatrix had always blamed plaintiff for everything that went wrong; and blaming her with the "treaty" and not settling the divorce, and not winning a divorce case, was "just the climax." On December 11, 1939, testatrix wrote her daughter reporting the collection of $30 rent from the daughter's house and deducting certain items of expense and also an alleged $15.50 loan, which in fact had been a 1938 Christmas present. Testatrix also deducted eight cents for the money order for the original $15.50 remittance.

About the same time plaintiff wrote testatrix stating that she was so nervous that she had been advised to drop some of her work before another breakdown. She complained of her mother's conduct in abusing her and her father and said: "I'm not angry. I'm just thru. That means I want no letters or calls from you & I don't want to see you. This feeling may last a month or it may last years, but I mean it." At the same time plaintiff returned to her mother unopened two of her mother's letters. Later, testatrix returned plaintiff's letters unopened. One contained a note indicating that testatrix did not like her "attitude toward paying * * * a legitimate debt of long standing."

Plaintiff came to Springfield in June 1940, and spent an evening with testatrix. Testatrix told plaintiff she had never wanted a child but, if she had one, she wanted a boy. She told plaintiff about a boy who had lived with her, and how much she thought of him. She told plaintiff that this boy was her son and she no longer needed plaintiff. She accused plaintiff of·sleeping with her own father. She said that Mrs. G——— had slept with plaintiff's father and that Aunt Sallie had slept with him. Mrs. G——— was the mother of five children and had worked for testatrix for seventeen years. Testatrix said that plaintiff was responsible for the result of the divorce suit and at the same time told plaintiff she had never loved Mr. McKee; that she had been in love with another man but had married Mr. McKee because of his financial prospects.

In August 1940, testatrix wrote the trial judge in the divorce action that she had signed the "treaty" because of threats by her daughter, but plaintiff testified that no such threats had been made. In July 1940, testatrix wrote plaintiff to the effect that plaintiff's father had rejected her; and that testatrix had "fought his rejection of you." The correspondence between mother and daughter continued during the remainder of 1940 and, on November 26, 1940, testatrix wrote that she had an invitation to spend Christmas with friends and said: "I believe at some other time there would be a place for you." Plaintiff acknowledged the letter and said she would come at another time. She invited her mother to visit her in the meantime, which testatrix did. Since plaintiff was not invited to be with her mother at Christmas time, she accepted an invitation to be with her father and Aunt Sallie in Warrensburg and, thereafter, testatrix wrote a most bitter and threatening letter to plaintiff. Testatrix construed plaintiff's trip to Warrensburg as an insult and as an approval by plaintiff of the alleged action of Mr. McKee and Aunt Sallie.

On July 12, 1941, the day on which plaintiff's father was killed in an automobile accident, plaintiff received from testatrix a box containing a baby cap and two of plaintiff's baby dresses, a picture of plaintiff when she was four years old (marked "daughter of divorce") an envelope containing plaintiff's baby hair, a copy of John and Grace McKee's marriage service with red underscoring, a group of cut and mutilated pictures, a bundle of scraps from grandmother's dresses, newspaper accounts of testatrix' wedding, the grandmother's funeral service memorial, some keepsakes of the grandmother and two letters written by Mr. McKee to testatrix before they were married. This action did not terminate the relationship, as the correspondence resumed and continued.

Plaintiff received between $24,000 and $25,000 from her father's estate and $14,300 of life insurance. The net value of her father's estate was $34,000, but testatrix in a letter fixed the amount at $49,667.43.

Plaintiff was married September 5, 1941, apparently, while testatrix was on a trip to Alaska with friends. Testatrix wrote cards to plaintiff while on this trip. Plaintiff later wrote her mother about the marriage and also about the release of certain funds derived from real estate in Arkansas, released by testatrix in her divorce settlement. A controversy over the fund derived from a condemnation action as to the property promptly ensued and plaintiff, ultimately told testatrix to hire a lawyer, and also said: "If you have any desire ever to make up with me never say another thing against Dad to me." The bitterness grew worse and plaintiff was accused of favoring her father for financial rewards, also of keeping him from remarrying. Testatrix continued to write letters abusing Aunt Sallie and plaintiff's father and plaintiff. In December 1941, testatrix wrote plaintiff as follows:

"'Twas one, two and three days before Christmas back in '37.

"By telephone, wire and prayers to heaven

"A mother to her child pled 'Come home it may be your last,'

"'God-dam her, let her stay,' came a curse from a bed.

"The train whistled in, and it was a reconciliation that lasted until he was dead."

Other letters from time to time contained a phrase, which the witnesses could not explain, to wit, "But, Mrs. Schultz she is her mother." In January 1942, testatrix wrote her daughter, as follows: "That soft spot in his heart for me that you spoke of makes no impression on me in the least. Lies, cheating, cruelty, infidelity and hypocrisy leave no soft spots. * * * You both broke my heart, and I am bequeathing you this broken heart that you may have it soon because you had such a great part in its breaking. * * * From time to time, now, I hope that you will see fit to return to me some of the money you asked me to loan you, that I gave, and even borrowed from Mother for you. I gave it to you in no such spirit never thought of such a thing then. But you have changed my view point now." The money mentioned was given for the daughter's "schooling" in 1926 and 1927.

In June 1943, testatrix wanted to buy an Arkansas farm from her daughter for the 1941 appraised value. The daughter refused because of the increase in value and because the daughter did not want to sell. This resulted in further bitter letters. Later, in May 1944, when it was suggested by friends that mother and daughter make up, and plaintiff agreed, testatrix said that to make up they had to settle all of their past differences. On the phone later, when plaintiff said they would have to forget the past and start again, testatrix began to abuse her and her father and plaintiff quit talking. On June 14, 1944, testatrix wrote plaintiff "our relationships are closed. The curtain is drawn forever. This is finis

through the rest of my life and I hope in my death." Certain gift handkerchiefs were returned. There were no contacts between mother and daughter between July 1944 and December 1947. In December 1947, plaintiff sent her mother a Christmas card. It was returned with a notation including the words: "I never want another Christmas card like this from you. I will never need you nor any part of your money * * * I know enough about Werdna, Sallie Brown and John McKee to break any mother's or wife's heart." Subsequent efforts by the daughter for reconciliation were unavailing.

On February 7, 1950, testatrix wrote one of the defendants a letter, in which she charged that plaintiff with her father had planned to put testatrix in an insane asylum. Testatrix had retained a handwritten copy of this and many of her other letters.

On March 13, 1952, testatrix wrote her daughter in part as follows: "Once you entered a plan to put me in an insane asylum when you and everybody else knew I was not insane, to force me to sign away my property rights. That with other things that I know has broken my confidence in you. When I have a broken confidence I want no more to do with that person. * * * I know that you planted a bomb shell between my mother and me. * * * Please do not answer this letter. If you write the letter will be returned to you unopened."

Plaintiff had never entered into any plan to place her mother in an insane asylum or tried to force her to sign her rights away. The rights of the testatrix in the Arkansas property were voluntarily signed away in the divorce settlement and the court so decided in the condemnation matters in 1941. Plaintiff planted no bomb shell between her mother and grandmother in 1933 and had caused no trouble between them. The will in contest was executed April 10, 1952, less than 30 days after the date of the above letter.

Plaintiff further testified that she could not say that she and her mother were good friends after 1938, and that by 1939 there was more or less affront on both sides but hoping they "could get back on very friendly relations." Plaintiff said that her mother had been mentally ill for a number of years before the divorce and her condition was quite progressive; that both her father and mother had violent tempers; that her mother suffered periods of depression from 1933 and would cry over everything that displeased her; that she would go to bed and stay for several days and cry; that the main trouble was "nerves", although from 1934 to 1939, testatrix had hemorrhoids, pains in the chest and back, stomach ulcers, and "just generally complained"; that testatrix had stopped living with her husband in 1938, because she hated him and didn't want to touch him; that testatrix had a man she would like to have dated but apparently did not; that testatrix dictated the terms of the "treaty" and then falsely claimed to Judge White that her daughter threatened her and forced her to sign it. After the failure to get a divorce, testatrix repeatedly blamed her daughter for influencing her to sign the "treaty", but plaintiff had not influenced her or advised it.

One of defendants' witnesses, a neighbor of the testatrix from about 1927, testified that testatrix was unfriendly toward plaintiff; that that feeling got more bitter down through the years; that testatrix was a very nervous woman and she didn't see how she could be more nervous; that she was very excitable and witness didn't "think she could become more excitable"; and that she was very sad and very depressed and would cry.

Dr. A. B. Jones of St. Louis, a specialist in nervous and mental diseases had not treated testatrix, but he had examined the numerous letters in her handwriting, which letters were in evidence, and he had examined a certified copy of her last will. In answer to a question, which hypothesized

that the numerous letters and documents were written by testatrix, he testified that in his opinion testatrix was of unsound mind on April 10, 1952. He said "she had an irrational mind, and had been increasingly so over a period of years"; and that "toward the end of the letters submitted here, they are wild and otherwise abnormal." He said that periods of depression and threatened suicide meant a sick mind; that such a person is mentally ill. The witness then referred to various statements contained in the letters evidencing paranoid ideas and delusions. He referred to certain exhibits as evidencing mental illness and as showing an unsound mind. He said the symptoms of mental illness were "pretty well set out in her letters"; that her thinking was helter-skelter, she didn't stick to one subject, but jumped around; but that she returned to her dominant fixed idea or controlling complex about her husband. The letters indicated that money was also a fixed idea and a controlling complex; and that she bragged on herself and exalted her friends. The witness said that the letters indicated that testatrix had a split personality which was one of the cardinal signs of schizophrenia. He said it was possible for a person suffering from mental illness and split personality to associate with other women of her social class and to go out socially and yet nobody know she was suffering from mental illness, since there was no destruction of the brain or any gross brain diseases. Abnormalities in the thinking of testatrix as evidenced by the content of the letters were pointed out as tending to show irrational thinking, that is, not in the usual, or normal manner. He admitted that the will tended to show that testatrix knew, the extent of her property, knew she had a daughter, but didn't want her to have the property and named those she wanted to have it.

Dr. William I. Park, a physician, a graduate of St. Louis University School of Medicine, had treated testatrix as her personal physician from November 1950 until her death in 1954. As a witness for de-fendants, he testified: 'Well, if we are to be practical about this thing, I think she was of sound mind * * * She seemingly had her faculties * * * so far as conducting her business; * * * she made no statement that would make me feel that she was of unsound mind." As to whether or not he saw evidence of a split personality, he said: "I don't think I can answer that." He saw nothing abnormal, "other than that with reference to her own physical disability * * * physical complaints." On cross-examination he testified that he had not talked to her about "her personal problems." He admitted that he had told counsel that he could not say of her whether she was sane or insane; that she was on the border; that he had not had enough experience to judge; that she was an abnormal person; that his relations with her were unsatisfactory because she had no confidence in him, but continued to come to him; and that she had a persecution complex, with periods of extreme depression and extreme elation. He further testified that "if you take it strictly as a hard and fast answer, those things were said," when he had been interviewed by counsel for plaintiff.

Did contestant make a case for the jury on the issue that the will was the product of an insane delusion that plaintiff and her father had conspired to have testatrix committed to an insane asylum?

In Conner v. Skaggs, 213 Mo. 334, 348, 111 S.W. 1132, 1135, the court approved a statement as follows: "An insane delusion is an unreasoning and incorrigible belief in the existence of facts which are either impossible absolutely, or, at least, impossible under the circumstances of the individual. It is never the result of reasoning and reflection; it is not generated by them, and it cannot be dispelled by them; and hence it is not to be confounded with an opinion, however fantastic the latter may be." In Sayre v. Trustees of Princeton University, 192 Mo. 95, 126, 90 S.W. 787, 796, the court said: "No belief that

has any evidence for its basis is in law an insane delusion." In Gaume v. Gaume, 340 Mo. 758, 102 S.W.2d 636, 640, the court said: "Insane delusions are not the result of reasoning, however erroneous or unjust the result may be, but must be without any and contrary to all reason."

There is no such thing as an insane delusion founded on facts; if the idea entertained has for a basis anything substantial, it is not a delusion. Ahmann v. Elmore, Mo.Sup., 211 S.W.2d 480, 486; Fulton v. Freeland, 219 Mo. 494, 517, 118 S.W. 12.

In Everly v. Everly, 297 Mo. 196, 249 S.W. 88, 92, the court said: "In order, then, to constitute an insane delusion it must have no basis in facts which would induce belief in a rational mind. There may be facts which would create the delusion in a diseased mind, or in a jealous mind which had become morbid by dwelling upon imaginary wrongs. * * * It is not a belief formed in an entire absence of facts, but a belief formed in the absence of any facts which would bring a conviction to a rational mind, that determines whether or not the belief is an insane delusion." And see Zorn v. Zorn, Mo.Sup., 64 S.W.2d 626, 628; Erickson v. Lundgren, Mo.Sup., 37 S.W.2d 629, 634; 57 Am.Jur. 90, Wills, Sec. 80; 94 C.J.S. Wills § .18, p. 708.

To invalidate a will on such ground the evidence must not only show the existence of an insane delusion at the time the will was executed, but also that it had a direct influence on the execution of the will. Clingenpeel v. Citizens' Trust Co., Mo.Sup., 240 S.W. 177, 185; Erickson v. Lundgren, supra; 94 C.J.S. Wills § 65, p. 771; 57 Am.Jur. 91, Wills, Sec. 81. The inference that the insane delusion produced the will can of course be drawn from substantial circumstantial evidence, but the burden of proof to establish the existence of the alleged delusion rested on plaintiff. Hall v. Mercantile Trust Co., 332 Mo. 802, 59 S.W.2d 664, 672. In the case of Clingen-peel v. Citizens' Trust Co., supra, 240 S.W. 177, 186, it was pointed out (1) that "the fact that a testator is competent to transact complicated and important business, involving the exercise of suitable and adequate power, does not negative the existence of delusions which would deprive him of testamentary power"; and (2) that "it is well known that the insane are remarkable for subtlety and acuteness, and frequently impose on expert alienists." And see Hall v. Mercantile Trust Co., supra, 59 S.W.2d 664, 670; Fulton v. Freeland, supra, 219 Mo. 494, 515–517, 118 S.W. 12; Evans v. Partlow, 322 Mo. 11, 16 S.W.2d 212, 215; 94 C.J.S. Wills § 17, p. 708.

We have seen that plaintiff's evidence shows that testatrix wrote a letter to Mrs. Barbour with reference to plaintiff in February 1950 in which she stated: "I, her mother, believe that the only interest she has in me might be what little I possess, because she has been very cruel to me since 1939, and because she planned, with her father, to put me in an insane asylum and force me to sign away all my property rights; and because I fear her cruelty to me should I become ill, I do not want her, Werdna Drucille Hardy, to assume care of me in any way at anytime."

On March 13, 1952, immediately prior to the execution of the will of April 10, 1952, testatrix wrote her daughter a letter containing this paragraph: "Once you entered a plan to put me in an insane asylum when you and everybody else knew I was not insane, to force me to sign away my property rights. That with other things that I know has broken my confidence in you. When I have a broken confidence I want no more to do with that person."

As we have seen, plaintiff testified that she had never entered into any plan to place her mother in an insane asylum. No evidence of such a plan appears from plaintiff's evidence and there is no evidence

in plaintiff's case to support such belief by a rational mind.

Respondents point to the fact that plaintiff testified that she concluded in 1934 that testatrix was mentally ill because of the things she did in Florida and because of the change in her behaviour to something entirely different from anything plaintiff had known of her before. Respondents also refer to the fact that plaintiff had written her father in 1934 that she felt her mother was neurotic and the evidence shows her mother had seen this letter and was quite bitter about it. Respondents ask, "Why was it an insane belief on the part of the mother that her daughter would want her in an institution?" The facts referred to do not support a conclusion based upon reason that plaintiff had planned with her father to put testatrix in an insane asylum. A jury could infer that such delusion was not based on facts or reason. Respondents, therefore, seek to rely upon the testimony of one of defendants' witnesses (Mrs. Owens) as to a fact which was expressly contradicted by plaintiff's witness (Mrs. Martha McKee) to the effect that in 1950 Albert McKee had told testatrix, in the presence of Mrs. Owens and Mrs. Martha McKee, that "John and Werdna had planned to have you put in an insane place." Respondents say the court may consider this testimony of defendants' witness because counsel for plaintiff, in his argument to the jury, reviewed this witness' testimony concerning facts testified to by the witness which were favorable to plaintiff and then said "There is one of the defendants who is telling the truth in this case. That falls from the lips of one of the beneficiaries. Mrs. Owens came forward, in her womanhood, and showed you the true picture of Mrs. McKee * * *." We find nothing in this argument which admits to be true that part of the witness' testimony which was expressly contradicted by plaintiff's own witness. Respondents further contend that, in any event, any such insane delusion could not have been a producing cause of the 1952 will, because testatrix had cut plaintiff off in 1941 with only $50. This argument is on the theory that this insane delusion came into existence after the 1941 will was written.

Whether or not the insane delusion (to the effect that plaintiff and her father had planned to put testatrix in an insane asylum) was a direct and producing cause of the will in question was a question of fact. Testatrix' mental illness had existed over a long period. The jury could consider all of the evidence in the record as well as the terms of the will by which plaintiff, an only child, was cut off by her mother with $1 and substantially all of testatrix' property given to strangers to the blood. Meier v. Buchter, 197 Mo. 68, 89, 94 S.W. 883, 6 L.R.A.,N.S., 202; Schultz v. Schultz, 316 Mo. 728, 293 S.W. 105, 110; Wade v. Kirksville College of Osteopathy, Mo.Sup., 270 S.W.2d 811, 814; Evans v. Partlow, supra, 16 S.W.2d 212, 216. On a view of the evidence favorable to plaintiff there was no evidence to support testatrix' belief that plaintiff and her father had planned to put testatrix in an insane asylum. Such belief, as evidenced by the letters written by testatrix, was wholly without any basis in fact whatsoever. What effect it had was for the jury. The issue as to the existence of such insane delusion, when it came into existence, and whether it was a producing cause of the will, were all issues for the jury. The court erred in entering judgment, as a matter of law, that the will in question was the will of Grace Thompson McKee, deceased.

Was the issue of testamentary incapacity for the jury? The general rule often stated is that, " 'A testator with mind enough to understand,' the ordinary affairs of life, the kind and extent of his property, who are the natural objects of his bounty, and that he is giving his property to the persons mentioned in his will, in the manner therein stated, is capable of making a will under the law of this state." Rex v.

Masonic Home of Missouri, 341 Mo. 589, 108 S.W.2d 72, 84; Pulitzer v. Chapman, 337 Mo. 298, 85 S.W.2d 400, 414–416; Walter v. Alt, supra, 152 S.W.2d 135, 142; Adams v. Simpson, 358 Mo. 168, 213 S.W. 2d 908, 911. In this case, as we have seen, there is evidence from which it may be inferred that the will by which plaintiff was disinherited was in fact made under the influence of the insane delusion, hereinbefore referred to, and also as a result of an unnatural hatred of her daughter. In other words, the record shows that, except for her relationship to her own family and particularly to her own daughter, testatrix was a normal person.

The petition in this case charged that at the time the will was executed the testatrix "was incompetent and not of sound and disposing mind and memory and *she was incapable of recognizing the natural objects of her bounty* and was wholly incapable of making a testamentary disposition of her affairs." (Italics ours). The major portion of this record concerns this particular issue and is directed to the personal relationship of testatrix to her only child, her daughter, the plaintiff. Much of this evidence is in the handwriting of the testatrix and consists either of the handwritten copies of correspondence retained by testatrix, or the originals which were sent to plaintiff and others. No statement of facts, absent a full copy of this correspondence over the years can give any adequate picture of the evidence of testamentary incapacity of testatrix in her relationship to her only child. This correspondence and a favorable view of the oral testimony of plaintiff and her witnesses tend to show an abnormal and wholly unnatural feeling of a mother toward her daughter. This feeling appears to have been exhibited over a long period of years, including the periods during which the 1941 and 1952 wills were executed.

We think the legal principles reviewed in the case of Evans v. Partlow, supra, 16 S.W.2d 212, 216, are particularly applicable

here. The issue there was testamentary incapacity, especially as related to an only child. The court quoted from certain cases as follows: " 'One who cannot recall or comprehend what he has done for, or the obligations he morally owes to, the natural objects of his bounty, is without testamentary capacity.' * * * 'The question of mental capacity involves whether the testator's mind was in such condition that he recognized his obligation to the objects of his bounty and their relation to him. Undoubtedly a very unjust disposition of his property, a disposition which would disinherit a deserving child, would be some indication of failure to understand his obligation to the child.' * * * 'But in order to sustain any unjust, unnatural or absurd will, which may be contested, fair proof at least should be afforded that the testator was of sufficient capacity at the date of execution to comprehend its import: * * * In fine, a harsh and unnatural disposition by the will in question, is a circumstance which tends to discredit the maker's testamentary capacity.' "

The court held there was evidence "that the testator at the time of making the will was of unsound mind and especially so in reference to the plaintiff." The court then said: "There is ample evidence in this case from which the jury could find that the testator could not permanently rid himself of his delusion, and that he was unreasonably dominated by an overpowering aversion to his son that incapacitated him from discerning, comprehending, feeling, and appreciating the deserts of his son and his natural obligations to him. It is not enough that he knew what property he had and knew he had a son and four sisters. To have testamentary capacity his mind must have functioned so as to enable him intelligently to weigh and appreciate his natural obligations to his son. The testator's long-continued brutal conduct toward this son was unnatural and tended to prove that he was of unsound mind." 16 S.W.2d 212, 216, 217(3).

As stated, the $1 legacy provided by the will for testatrix' only child and the transfer of her entire estate to strangers to the blood was some evidence of a harsh, unnatural and unjust discrimination or inequality in the disposition of testatrix' property, which the jury could consider with other evidence on the issue of testamentary incapacity. Guidicy v. Guidicy, 361 Mo. 1127, 238 S.W.2d 380, 384; Norris v. Bristow, 361 Mo. 691, 236 S.W.2d 316, 320, 26 A.L.R.2d 366. In Meier v. Buchter, 197 Mo. 68, 87–88, 94 S.W. 883, 6 L.R.A., N.S., 202, it is said that where the will is an unnatural one and there is other evidence of testamentary incapacity, the circumstances call for some reasonable explanation of the unnatural character of the will. Also see Guidicy v. Guidicy, supra; and Chambers v. Chambers, 297 Mo. 512, 249 S.W. 415, 418. Much evidence as to the reasonableness and the unreasonableness of the provisions of this will appear in this record. The same reasons for disinheriting plaintiff that were assigned in the 1941 will were repeated here, but the 1941 will was written before plaintiff's father's will had been opened. Space does not permit a further review of the facts, shown by this record. Without undertaking to further review the facts, which have had to be briefly stated for the purpose of this opinion, we must and do hold that the issue of testamentary incapacity, particularly as it relates to testatrix' mental capacity to recognize, weigh and appreciate her obligations to the natural object of her bounty, her only daughter, was on this record a matter for the jury's determination.

The court, therefore, erred in sustaining defendants' motion for judgment, in accordance with defendants' motion for a directed verdict made at the close of all the evidence. The judgment, so entered, is reversed.

As we have seen, the trial court sustained defendants' motion for a new trial effective in the event the court's judgment be reversed on appeal. Appellant has assigned error on that order. The ground assigned for the order granting a new trial was as follows: "The court erred in giving instruction No. 1, said instruction not being based on the pleadings or supported by the evidence."

The first issue presented is whether instruction No. 1 submitted an "insane delusion" not pleaded, or mental incapacity which was pleaded. If it submitted an "insane delusion" which was not pleaded, we would have to consider the trial theory and the applicability of Section 509.500 RSMo 1949, V.A.M.S. As stated, we think that only testamentary incapacity was submitted by instruction No. 1. Plaintiff submitted her case on three instructions. The instruction dealing with an insane delusion concerning a plan to confine testatrix in an insane asylum is not in question. Only two other instructions were given at plaintiff's request. One was to the effect that the burden of proof was on defendants to show testamentary capacity, to wit, "that, at the time of the signing and execution thereof, the said Grace Thompson McKee had sufficient understanding to comprehend the deserts of her daughter, who was the natural object of her bounty, with reference to her daughter's conduct and treatment of her, and unless the defendants have shown * * *." This instruction is not questioned.

The other instruction, No. 1, was as follows: "The Court instructs the jury that although you may find and believe from the evidence that Grace Thompson McKee, deceased, at the time of executing the paper writing offered in evidence as her last will and testament had and possessed many of the mental requisites, in these instructions set out as necessary to qualify her to make a valid will, yet, if the jury further find from the evidence that the said Grace Thompson McKee had, for a long period of time prior to the execution of such paper writing offered in evidence as her will possessed a strong aversion, dislike, anger, ill will or hatred toward her daughter Werdna McKee

Hardy without cause or reason, and that such aversion, dislike, anger, ill will or hatred, if such you find, continued to and existed at the date of the execution of the paper writing offered in evidence as her will, and that such aversion, dislike, anger, ill will or hatred, if any, overcame and controlled the will and judgment of the said Grace Thompson McKee in the execution of the paper writing offered in evidence as her will and that without the operation of such aversion, dislike, anger, ill will or hatred upon and controlling her mind and judgment the said Grace Thompson McKee would not have executed said paper writing offered in evidence as her will, then you should find that the paper offered in evidence is not the will of Grace Thompson McKee, deceased. But mere aversion, dislike, anger, ill will or hatred, even though unreasonable, are not sufficient to defeat the will. The aversion, dislike, anger, ill will and hatred, if such existed in the mind of said Grace Thompson McKee, against her daughter, must, in order to defeat the will, have been such as to overcome, and control the will and dethrone the judgment of said Grace Thompson McKee in matters concerning her said daughter and must have existed at the time of the execution of the paper writing offered in evidence as her will."

It is apparent that instruction No. 1 is very similar to instruction No. 3, which was given in the case of Evans v. Partlow, supra, 16 S.W.2d 212, 217. In that case the plaintiff had pleaded testamentary incapacity of the testator, "especially toward his only child, Hubert Evans." In that case the instruction was objected to on appeal on the ground that it did "not require the jury to find that such aversion or dislike was without cause or reason, or that it amounted to delusional insanity." The court held that " * * * when plaintiff's instruction is read as a whole, the latter part indicates and the jury would understand, *if it were material,* that the testator's aversion to his son must have been unreasonable. When the whole instruction is read it seems to be very favorable to the appellants and could not have mislead the jury." (Italics ours).

■ We think the record in the case before us, considered as a whole, tends to show that the parties tried the case on the theory that the major portion of the evidence offered by plaintiff was offered as tending to show that testatrix was controlled and dominated by a strong aversion, dislike, anger, ill will or hatred for her daughter without cause or reason, which hatred overcame and controlled her judgment at the time the will was written. Apparently the parties considered this evidence admissible as evidence of testamentary incapacity, an issue pleaded in the petition. Much of the evidence offered and received in evidence without objection was admissible on no other theory. Defendants objected to instruction No. 1 when it was offered, but when it was given, the defendants were forced to join in that submission, as they did. The trial court held the instruction erroneous on the ground that it was not supported by the pleadings and evidence. We think the instruction conformed to the pleadings and trial theory of the parties. It does not purport to submit an insane delusion and no such finding is required. The instruction is within the issues made by the pleadings and it is abundantly supported by the evidence. The legal sufficiency of the instruction as drawn and submitted is not presented for determination nor ruled, but, as heretofore noted, we hold that the instruction submits testamentary incapacity particularly as related to the ability of testatrix to consider, weigh and appreciate the deserts of her daughter and her natural obligations to said daughter. The legal sufficiency of the evidence and trial theory to support a submission of *insane* hatred as an *insane* delusion is not presented nor ruled.

The judgment is reversed, as stated, and the alternative order granting a new trial is set aside and the cause remanded with

directions to reinstate the verdict of the jury and enter judgment in conformity therewith.

*All concur.*

On Motion for Rehearing.

PER CURIAM.

On motion for rehearing respondents complain that plaintiff's evidence has not been considered as a whole, but only part isolated from the rest; and that "matters appearing in plaintiff's evidence which are fatal to her prevailing in this action" have been omitted from the statement of facts. We think that all admitted or conceded facts adverse to plaintiff's position are sufficiently shown in the opinion. Of course many details affecting credibility, weight and value of her evidence and many facts not admitted or conceded and not binding on plaintiff were necessarily omitted. Some facts of which respondents complain, to wit, admissions by plaintiff as to the unfriendly relationship and lack of affection between herself and her mother and the admissions of plaintiff's witness, Dr. Jones, sufficiently appear from the opinion.

■ Respondents continue to insist that plaintiff's Instruction No. 1 submits the issue of insane hatred as an insane delusion, and separately from the submission of general testamentary incapacity; and that the issue of insane hatred is not sustained by the pleadings. While conceding that the instruction in question was taken from the case of Evans v. Partlow, 322 Mo. 11, 16 S.W.2d 212, 217, where no insane delusion was pleaded and where the instruction was approved, respondents say that that case may be distinguished because, there was no issue as to the pleadings and because "the defendants *admitted* that testator suffered from an insane delusion." However, the opinion in that case states: "Moreover, defendants' instruction is a solemn admission *that there was evidence tending to prove* that at time the will was made, the testator was subject to a delusion as to his son's legitimacy and that he was dominated by an unreasonable aversion to him." (Italics ours.) Defendants did substantially the same in this case. If Instruction No. 1 submits insane hatred as an insane delusion, as respondents contend, their position is not improved. The opinion shows the allegations stricken from plaintiff's petition, the opening statement of her counsel, the statements of the trial judge in the course of the trial, the evidence offered and certain instructions requested by defendants and given. Reference is made to Section 509.500 RSMo 1949, V.A.M.S., and it is shown that there was no request for a directed verdict on the ground that the evidence was insufficient to sustain a submission of insane hatred as an insane delusion and no withdrawal instruction was requested on that issue and the sufficiency of the evidence on that issue was not otherwise tested, but instead defendants offered and the court gave the instructions set out in the opinion and defendants thereby joined in the submission of whatever issue was in fact submitted by plaintiff's Instruction No. 1, whether testamentary incapacity, as stated, or insane hatred as an insane delusion, as respondents contend.

Respondents further say that the opinion overlooked or failed to state certain facts shown by plaintiff's evidence which, "as a matter of law", show that the "strong aversion, dislike, anger, ill will or hatred * * * was *not* without cause or reason." Respondents' theory is "that family bickering and quarrels will not justify or sustain the setting aside of a will" on the ground of an insane hatred or delusion. We think the facts are sufficient to sustain the submission of testamentary incapacity, as stated, but, if they are not, this argument does not necessarily aid respondents because, if plaintiff made a case for the jury on any theory properly submitted, the trial court erred in entering the judgment probating the will, notwithstanding the verdict against the will, and if Instruction No. I submitted insane hatred as an insane de-

lusion, the respondents by their instructions joined in that submission without ever having in any manner tested the sufficiency of the evidence on that issue.

Respondents further say that, if testatrix was a normal person "except for her relationship to her own family and particularly to her own daughter," she was suffering from "a species of insanity or mental incapacity, to wit, an insane delusion," which must be pleaded, proved and submitted as such. Respondents cite Zorn v. Zorn, Mo.Sup., 64 S.W.2d 626, 627. In the Zorn case, the plaintiff pleaded testamentary incapacity and undue influence. At the close of the evidence the court sustained a demurrer as to testamentary incapacity and submitted undue influence. However, plaintiff further instructed on "strong aversion, dislike, anger, ill will, or hatred toward" a son. The court said "such an instruction" had no place in the case, and further pointed out that the instruction did "not require a finding that the ill will, dislike, or hatred which testator had toward the plaintiff was without cause or reason or amounted to an insane delusion." Here Instruction No. 1 required a finding that the hatred was "without cause or reason." Further the instruction in the Zorn case was held erroneous on the theory that it was not supported by the pleadings or the evidence. In the Zorn case there was neither pleadings, nor evidence, nor trial theory to sustain the submission of insane hatred and there was no contention on appeal that a case was made for the jury on the basis of testamentary incapacity. The case is not controlling on the issues presented here.

Respondents say that the holding to the effect the "parties tried the case on the theory the extensive correspondence between mother and daughter was admissible to show testamentary incapacity and to show ill will and dislike sufficient to invalidate the will" is contradicted by the record, and reference is made to specific pages of the record which show that exhibits 31 to 81, inclusive, were admitted without objection. Respondents' counsel stated: "* * * we have no objection to the introduction of any of those items, and we do not require the identification of any of them; it's agreed that the person who purports to write them did write them, and the person who purports to have received them did receive them." Subsequent remarks of counsel that they were not conceding in any way that the letters established or tended to establish insanity on the part of the deceased; and that they did not think the letters, as a matter of law, were sufficient to sustain an inference of insanity on the part of the deceased, are immaterial.

Respondents say that in their brief on appeal they contended that Instruction No. 1 was erroneous in form because it "failed to require a finding * * * that such ill will or dislike amounted to an insane delusion"; and that the opinion holds the instruction correct without that requirement. No such issue was presented on appeal. The fourth point of respondents' brief is: "The trial court correctly ruled that, in the event of his judgment for the will being reversed, a new trial should be awarded because of the giving of Instruction No. 1, which was neither supported by the pleadings nor the evidence." This assignment does not seek to sustain the motion for new trial on the ground of alleged insufficiency in the form of Instruction No. 1, as a submission of ill will and hatred as an insane delusion. There is a recital subsequently under this heading of the brief that "it is held that the alleged hatred must amount to an insane delusion and an instruction which fails to require a finding on this point is erroneous." This recital does not present an issue for determination different from the main heading under which it appears that Instruction No. 1 is not "supported by the pleading nor the evidence."

Few issues were presented on this appeal. If plaintiff made a case for the jury on any issue that was properly submitted to the jury, the trial court erred in entering judg-

ment as a matter of law in favor of the will, and if Instruction No. 1 is supported by the pleadings and the evidence, the trial court erred in ordering a new trial. We have so held. No other ground of error to support the order granting the new trial was presented. In these circumstances the verdict should be re-instated and judgment entered thereon. The motion for rehearing or to transfer to the Court en Banc overruled.